**Annette BURRUS, Appellant,**

v.

**David REYES and Sonia Valenzuela, Appellees.**

No. 08–14–00265–CV

Court of Appeals of Texas, El Paso.

March 8, 2017

172

Veronica Carbajal, El Paso, TX, for Appellees.

Annette Burrus, El Paso, TX, for Appellant.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

YVONNE T. RODRIGUEZ, Justice

David Reyes and Sonia Valenzuela ("the Reyes Family") thought they were buying a mobile home and a one-half acre lot from Annette Burris under an oral contract for deed. Burrus, on the other hand, contended the Reyes Family was only renting the property. After the Reyes Family had lived on the property for 17 years and had made numerous improvements to the property, Burrus sold the lot to a third party and ordered the Reyes Family to vacate. The Reyes Family sued for breach of contract, statutory fraud, money had and received, and for violations of the Texas Property Code. The jury found, among other things, that Burrus had agreed to sell the property to the Reyes Family, had breached that agreement, and that her oral agreement to sell was enforceable under the partial-performance exception to the statute of frauds. The jury also found Burrus was liable for statutory fraud, for money had and received, and for liquidated damages under the Texas Property Code.

Burrus appeals on multiple grounds, contending the evidence is insufficient to show that the Reyes Family made the necessary permanent improvements to take an oral agreement out of the statute of frauds, to show that there was a meeting of the minds on the essential terms of the agreement, or to show that the parties intended to enter into a contract for deed. Burrus also contends that the trial court submitted the contract question to the jury improperly, that the statutory fraud claim is barred by limitations, and that the Reyes Family failed to prove they were entitled to liquidated damages under the Property Code or entitled to recover damages for money had and received. We affirm.

## BACKGROUND

 Burris is a licensed real estate agent with over 40 years of experience. In 1988, she purchased 10.75 acres of land in Tornillo, Texas as investment property.[1] Burrus then approached several individuals who had been renting from the prior owner, and inquired whether they wanted to purchase their rental property from her. It appears that most of the individuals entered into oral agreements to purchase their property through seller-financed, contract-for-deed transactions, in which Burrus agreed to finance the purchase price by allowing the individuals to make monthly payments until the amount financed was paid off, after which she would transfer title to them.[2]

[1] Tornillo is a generally economically distressed area of El Paso County that contains colonias. Colonias are "substandard, generally impoverished, rural subdivisions that typically lack one or more of the basic amenities of water, wastewater service, paved streets, drainage or electric service." *De La Cruz v. Brown*, 109 S.W.3d 73, 76 (Tex.App.–El Paso 2003), *rev'd on other grounds*, 156 S.W.3d 560 (Tex. 2004). There was evidence presented at trial concerning a history of recurring problems in the colonias of landowners selling lots to unsophisticated purchasers and later failing to fulfill their obligations with regard to the sales.

[2] A contract for deed, unlike a typical secured transaction involving a deed of trust, is a financing arrangement that allows the seller

### The Oral Agreement with the Reyes Family

In 1993, the Reyes Family, who had been living in government-subsidized housing with their two children, approached Burrus about the possibility of purchasing one of her lots. Burrus acknowledged that the Reyes Family initially asked to purchase rather than rent a lot from her. However, according to Burrus, she advised them that she had no lots for sale at the time and instead offered to rent them an unoccupied portion of her 10.75 acre tract. Burrus testified that she offered to purchase the Reyes Family a mobile home of their choice, which she would have moved to the property at her expense, and to rent the mobile home and lot to them on a month-to-month basis. Burrus claimed the Reyes Family orally agreed to the rental arrangement.

Both parties agreed that Burrus purchased a mobile home chosen by the Reyes Family and had the mobile home moved to the lot. Both parties also agreed that the Reyes Family paid Burrus $500 before moving into the mobile home in September 1994, and thereafter paid Burrus $200 a month until November 2011.[3] The parties, however, disagreed as to the purpose of those payments and the intent of their oral agreement. Burrus contended they had agreed to a landlord-tenant relationship, asserting that the money they paid her was for rent. The Reyes Family contended they had agreed to purchase the mobile home and lot for $21,000 with Burrus financing the purchase. They further believed that their initial $500 payment was a down payment on the property, pointing out they had put the notation "down payment" on their money orders to Burrus, and that the $200 monthly payments were to be applied to pay off their seller-financed mortgage loan from Burrus. As would be the case in a contract-for-deed transaction, the Reyes Family believed they would receive title to the property from Burrus once they paid off the loan.

According to the Reyes Family, throughout the 17 years they lived on the property, they repeatedly asked Burrus for documentation of the purchase, for receipts of their payments, and for additional information regarding the terms of their loan, as well as for an accounting of how much they owed on their loan, all of which Burrus failed to provide. Nevertheless, they testified that they trusted Burrus because she was the expert in real estate, and they believed that she would let them know when they had paid off the balance of their loan. Burrus, on the other hand, claimed she never gave them an accounting because she viewed the Reyes Family as renters and not purchasers of the property.

### The Improvements on the Property

Shortly after moving in, the Reyes Family began making improvements to the property, including installing a chain link fence around the perimeter of the lot, installing plumbing fixtures, lighting, and ceramic tile in the home, building a shed and

to maintain title to the property until the buyer has paid for the property in full. *Morton v. Nguyen*, 412 S.W.3d 506, 509–10 (Tex. 2013); *see also Shook v. Walden*, 368 S.W.3d 604, 624 (Tex.App.–Austin 2012, pet. denied) (under a contract for deed, "the purchaser obtains an immediate right to possession but the seller retains legal title and has no obligation to transfer it unless and until the purchaser finishes paying the full purchase price").

3. The parties initially agreed to a monthly payment of $185, but Burrus promptly raised the payment to $200 in January 1995, and informed the Reyes Family that the increase was to cover insurance expenses she intended to pay on the property.

a dog kennel, and planting trees. They also added a porch and several rooms to the mobile home, doing much of the work themselves. In order to make the additions, they paid to have the mobile home moved to the center of the half-acre lot and paid to have a concrete slab poured on which to build the additions. In all, the Reyes family spent over $22,000 in materials for the improvements on the property with no reimbursement from Burrus.

Burrus acknowledged that she had agreed to allow the Reyes Family to install a fence around the property and that the Reyes Family had paid for the installation and did not seek reimbursement from her. The Reyes Family contended that before the fence was installed, Burrus sent her father to assist the Reyes Family in ascertaining the dimensions of the lot and that her father pointed out the stakes that had been placed at the property's boundary lines during an earlier survey Burrus had done on the property. After ascertaining the dimensions, the Reyes Family installed the fence around the perimeter of the half-acre lot at a cost of $2,400.

Burrus acknowledged that she was also aware of the other improvements the family made on the property because she had driven by the property several times during the 17 years the Reyes Family lived there. Burrus testified that she did not require them to tear down the improvements, or penalize them for making changes to the mobile home, because she allegedly advised them that any improve-

ments made on the property would belong to her as the owner.[4] The Reyes Family also paid for all needed repairs on the property. Burrus claimed she had a similar agreement with all of her tenants.

### The Sale to Tornillo DTP

In March 2011, Burrus began negotiating to sell 1.76 acres of her original 10.75 acre tract to Tornillo DTP VI, L.L.C., which included the half-acre lot where the Reyes family was living and a vacant lot next door. Tornillo DTP was buying the property to fulfill a lease obligation it had made to Dollar General, which intended to build a store on the property. Burrus claims that she contacted David Reyes in May 2011 to advise him that she was considering selling the property, and told him the family would have to move if she sold the property. According to Burrus, David Reyes initially agreed to move, and she thereafter kept him apprised of her negotiations with Tornillo DTP.

Burrus signed a final contract with Tornillo DTP on January 31, 2012, in which she was to receive $90,000 for the sale, with a closing date of February 24.[5] Burrus testified that she informed David Reyes that same month that the contract had been finalized and that he was initially cooperative and agreed to move by March 31—the date on which she was required to convey the property to Tornillo DTP without any encumbrances. Burrus claims that the Reyes Family informed her on March

---

4. Burrus testified in deposition, however, that when she saw the improvements, she told the Reyes Family that they would have to "take [them] down." There is nothing in the record to indicate that Burrus ever required the Reyes Family to take down any improvements or that she otherwise penalized them for making any changes on the property.

5. In the contract, Burrus expressly represented that she had "no leases" on the property, and that she was transferring "vacant land" to Tornillo DTP. Burrus testified that she did not consider her rental agreement with the Reyes Family to be a lease since it was a month-to-month agreement. The contract did indicate there was a "mobile home with attachments" on the land that was "not part of sale."

that they were refusing to move and were claiming ownership of the land.

The Reyes Family, on the other hand, contended that Burrus did not advise them of the sale until February 2012 after she had already signed the final contract with Tornillo DTP. In November 2011, however, the Reyes Family had become suspicious that something unusual was occurring when Sonia Valenzuela noticed surveyors on the lot next door. Sonia Valenzuela testified that the surveyors informed her that a Dollar General store was going to be constructed on that property. The Reyes Family decided to suspend making payments to Burrus until they could speak to her and resolve the issue. Consequently, their final payment to Burrus was made in November 2011.

According to the Reyes Family, Burrus initially offered to relocate them to another lot on her tract. They refused the offer, however, because they wanted to retain their property, in part because of the difficulty involved in removing the improvements they had made to the property.

## The Initial Stages of the Litigation

Shortly after Burrus informed the Reyes Family of the sale, demolition crews hired by Tornillo DTP came onto their property and began removing some of the improvements they had made on the land, including the fence, trees, and the dog kennel. In April 2012, the Reyes Family sued both Burrus and Tornillo DTP, seeking a temporary restraining order, as well as a temporary and permanent injunction, restraining Burris and Tornillo DTP from entering the property and from any further destruction of their property. The Reyes family alleged they had an oral contract with Burrus to purchase the property, and sought declaratory relief naming them as the true owners of the property. They also sought compensation for the damages that had already suffered during Tornillo DTP's initial demolition efforts. In response, Tornillo DTP filed a forcible detainer lawsuit against the Reyes Family, attempting to evict them so that they could begin construction. Tornillo DTP also filed a breach of contract claim against Burrus for her failure to fulfill her obligation to transfer the property to them in an unencumbered state.

The trial court entered a temporary restraining order enjoining both Burrus and Tornillo from entering and damaging any property, which effectively stopped the construction of the Dollar General Store. Tornillo DTP thereafter entered into a settlement agreement with the Reyes Family, in which the Reyes Family agreed to vacate the property by June 9, 2012, and in exchange Tornillo DTP agreed to pay them $64,600 once they vacated the property. As part of the settlement agreement, the Reyes family agreed to execute a deed without warranty to Tornillo DTP, purporting to convey any interest they might have in the 1.76 acres Tornillo DTP purchased from Burrus. The Reyes Family subsequently nonsuited Tornillo DTP from the lawsuit.

Burrus was not part of the settlement agreement. Nevertheless, Burrus subsequently transferred ownership of the mobile home to the Reyes Family for $10, which allowed them to move the mobile home and its attachments to their new lot. Burrus testified that she signed the bill of sale because she felt that she had already "lost" the mobile home to Tornillo DTP since it had not been moved off the property as contemplated by the contract. Tornillo DTP thereafter obtained a summary judgment against Burrus on its breach of contract claim and recovered $166,000 in damages. This Court later affirmed Tornillo DTP's judgment against Burrus. *Burrus v. Tornillo DTP VI, L.L.C.,* No. 08-13-

00333-CV, 2015 WL 8526539, at \*3 (Tex. App.–El Paso Dec. 11, 2015, pet. denied) (mem. op. on reh'g, not designated for publication).

## The Remaining Claims Against Burrus

In its lawsuit against Burrus, the Reyes Family brought: (1) a claim for declaratory relief that prior to their settlement with Tornillo DTP, they were the sole owners of the property in question, based on a theory of either oral contract or adverse possession; (2) a claim for breach of contract alleging that Burrus breached their oral agreement to purchase the property and mobile home; (3) violations of Chapter 5 of the Texas Property Code for Burrus's failure to provide them with annual accountings and her failure to transfer title to the Reyes Family upon receipt of their final payment; (4) violations of Section 27.01 of the Texas Business and Commerce Code for statutory fraud for engaging in a fraudulent real estate transaction; (5) a claim for trespass to try title; and (6) a claim for money had and received, seeking to recover a portion of the profit Burrus had made on her sale of the property to Tornillo DTP.[6] Burrus counterclaimed for (1) tortious interference with an existing contract, claiming that the Reyes Family had interfered with her contract with Tornillo DTP, and (2) money had and received, claiming that the $64,600 Tornillo DTP had paid the Reyes Family belonged to her. Burrus also asserted that the statute of limitations had expired on the Reyes Family's claims against her.

6. Burrus testified that Tornillo DTP paid her $90,000 for the sale of the property, and that her profit on the sale, after closing costs, was $83,000.

7. The statute provides that when a seller engages in "two or more transactions in a 12–month period under this section," it is liable for liquidated damages in the amount of $250

## The Jury's Verdict and the Final Judgment

Following trial, the jury returned a verdict, finding that Burrus had orally agreed to the sale of the mobile home and lot to the Reyes Family and that Burrus had breached that oral agreement. The jury also found that the oral agreement came within the partial-performance exception to the statute of frauds. The jury awarded the Reyes Family $10 on the breach of contract claim. The jury also found that Burrus had committed statutory fraud and awarded the Reyes family $22,802 on that claim. The jury awarded the Reyes Family $24,000 on their claim for money had and received, finding that this was the amount money that "in equity and good conscience" belonged to the Reyes Family. Finally, the jury found that Burrus had conducted two or more contract for deed transactions in a 12–month period. The jury awarded the Reyes family $92,842 in attorney's fees, but denied their request for exemplary damages. They also rejected Burrus's counterclaims.

The trial court entered a final judgment on the jury's verdict, awarding the Reyes family a total of $70,052 in damages, together with attorney's fees of $92,842. Based on the jury's "two transactions" finding, the judgment included an award of liquidated damages pursuant to Section 5.077(d)(1) of the Property Code for Burrus's failure to provide an accounting to the Reyes Family from 1994 to 2011.[7]

a day for each day after January 31 that the seller fails to provide the purchaser with an annual accounting statement "but not to exceed the fair market value of the property[.]" TEX. PROP. CODE ANN. § 5.077(d)(1) (West Supp. 2016). The trial court capped the liquidated damages by the fair market value of the property.

## DISCUSSION

### Statute of Frauds

Burrus contends that any oral agreement regarding the sale of the property was subject to the statute of frauds, and that the evidence was factually insufficient to support the jury's implicit finding that the partial-performance exception applied, thereby barring enforcement of the agreement. We disagree.

### *Applicable Law*

The general statute of frauds requires that contracts for the sale of real estate must be in writing and signed by the parties in order to be enforceable. Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(4) (West 2015). Similarly, Section 5.072 of the Texas Property Code, which addresses contracts for deed, provides that an "executory contract is not enforceable unless the contract is in writing and signed by the party to be bound or by that party's authorized representative." Tex. Prop. Code Ann. § 5.072(a) (West 2014). It is uncontroverted that the oral contract for the sale in this case was not in writing or signed by either party.

 However, in Texas, an oral contract for the sale of real estate may be removed from the statute of frauds when the parties have performed the contract to such a degree that application of the statute would defeat its true purpose. *See Zaragoza v. Jessen*, 511 S.W.3d 816, 822–23, 2016 WL 3194769, at *4 (Tex.App.–El Paso June 8, 2016, no pet.) (citing *Carmack v. Beltway Dev. Co.*, 701 S.W.2d 37, 40 (Tex.App.–Dallas 1985, no writ) ("Under this exception, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud in the sense that the party acting in reliance on the contract has suffered a substantial detriment, for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit.")). In accordance with this doctrine, an oral contract for the purchase of real property is enforceable if the purchaser: (1) pays the consideration; (2) takes possession of the property; and (3) makes permanent and valuable improvements on the property with the consent of the seller, or, without such improvements, other facts are shown that would make the transaction a fraud on the purchaser if the oral contract were not enforced. *See Boyert v. Tauber*, 834 S.W.2d 60, 63 (Tex. 1992) (citing *Hooks v. Bridgewater*, 111 Tex. 122, 127, 229 S.W. 1114, 1116 (1921)); *see also Ratsavong v. Menevilay*, 176 S.W.3d 661, 667–69 (Tex.App.–El Paso 2005, pet. denied) (requiring a showing of "valuable and permanent improvements").

### *Standard of Review*

 We may set aside the jury's finding for factual insufficiency only if, after considering and weighing all of the evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *Baker v. Peace*, 172 S.W.3d 82, 87 (Tex.App.–El Paso 2005, pet. denied) (an appellate court will only set aside the jury's verdict if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust). In resolving a factual sufficiency challenge, we bear in mind that the jury is the sole judge of the weight and credibility of the evidence and is entitled to resolve any conflicts in the evidence and to choose which testimony to believe. *Telesis/Parkwood Ret. I, Ltd. v. Anderson*, 462 S.W.3d 212, 223 (Tex.App.–El Paso 2015, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d

802, 819 (Tex. 2005)). We therefore assume that the jury decided questions of credibility or conflicting evidence in favor of the verdict if it could reasonably do so, and we do not substitute our judgment for that of the jurors if the evidence falls within the zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 819–20. Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would clearly support a different result. *Baker*, 172 S.W.3d at 87 (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)).

### Analysis

Because the parties' agreement was for the sale of real property, it was subject to the statute of frauds as a matter of law. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015) (whether an agreement falls within statute of frauds is a question of law subject to de novo review); *see also Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 647 (Tex.App.–Dallas 2015, no pet.). However, the question of whether the agreement came within the partial-performance exception to the statute of frauds was a question of fact for the jury to decide. *See Blackstone Med., Inc.*, 470 S.W.3d at 647 (whether the circumstances of a particular case fall within an exception to the statute of frauds is

generally a question of fact for the jury to resolve).

 Thus, the trial court submitted the partial performance exception to the jury by instructing the jury that in order to find a valid oral agreement, it was required to find that the Reyes Family: (1) paid consideration for the property; (2) took possession of the property; and (3) made permanent and valuable improvements upon the property with Burrus's consent or that allowing Burrus to avoid enforcement of the contract would work a fraud upon the Reyes Family. Burrus does not challenge the sufficiency of the evidence to the first two elements, but instead contends that the evidence was factually insufficient to support the third element, *i.e.*, whether the Reyes Family presented sufficient evidence to show they made valuable and permanent improvements on the property.[8] Burrus acknowledges that the Reyes Family provided testimony and a list of improvements they made on the property, which totaled $22,882. Burrus contends, however, that the Reyes Family was required to present more than just a "list of what they spent," and that they were instead required "to show that the improvements were substantial and added materially to the value of the property." In support, Burrus cites to the Supreme Court's holding in *McGinty v. Hennen*, 372 S.W.3d 625, 627–29 (Tex. 2012) (per curiam). *McGinty*, however, is inapposite.

---

**8.** Burrus argues for the first time in her reply brief that the Reyes Family did not have exclusive possession of the property, claiming she possessed a portion of Tract 11A on which the one-half acre property was located. An issue raised for the first time in a reply brief is not properly preserved for our review. *Armstrong v. Roberts*, 211 S.W.3d 867, 873 n.4 (Tex.App.–El Paso 2006, pet. denied). In any event, the Reyes Family never claimed ownership in the entire Tract 11A, and instead, claimed ownership in only the portion of the

tract that Burrus acknowledges the Reyes Family exclusively possessed. Further, Texas has not adopted a rule requiring exclusive physical possession in order to meet the requirements of partial performance of an oral contract. *See Beard v. Anderson*, No. 05-14-00396-CV, 2015 WL 3823950, at *2 (Tex. App.–Dallas June 19, 2015, no pet.) (mem. op., not designated for publication) (citing *Sharp v. Stacy*, 535 S.W.2d 345, 350 (Tex. 1976)).

In *McGinty*, a homeowner was seeking to obtain damages for a contractor's breach of contract in performing shoddy construction work that led to water leaks and mold contamination. The homeowner presented evidence of his expenses in repairing the leaks and in remediating the mold issues, but did not present evidence that the expenses were reasonable or necessary. *Id.* at 627–28. The homeowner also failed to present any evidence to support the jury's verdict awarding him over $250,000 as the "difference in value between the house as received and a house built according to the contract," because he failed to offer any evidence of the house's value at the time of the purchase. *Id.* at 628. Unlike the plaintiffs in *McGinty*, the Reyes Family was not requesting damages for their expenditures, and the jury was not required to determine the exact value of the improvements or the "reasonableness" of the expenditures. Instead, the jury was only asked to determine whether the improvements made by the Reyes Family were valuable and permanent, which in turn would support their claim of partial performance.

■ Moreover, Burrus has not cited any authority requiring evidence that the property's market value was actually increased by the plaintiff's improvements to establish the partial-performance exception. To the contrary, a plaintiff may rely on testimony and evidence regarding the nature of the improvements made, and need not prove that the improvements actually increased the property's market value to establish the partial-performance exception. *See, e.g., Zaragoza,* 511 S.W.3d at 823, 2016 WL 3194769, at *4 (evidence that purchaser replaced the air conditioner, retiled and recarpeted, and made various electrical and plumbing repairs was sufficient to establish that valuable improvements were made to the property that satisfied the partial-performance exception to the statute of frauds); *see also Eastland v. Basey,* 196 S.W.2d 336, 338-39 (Tex.Civ.App.–Austin 1946, no writ) (evidence that purchaser built fences, conducted farming operations, moved and rebuilt a barn, installed a corral, enlarged a living room, added new doors and windows, and re-roofed the home was sufficient evidence that the purchaser made valuable and permanent improvements on the property); *Ratsavong,* 176 S.W.3d at 664 (evidence demonstrating that a purchaser repaired a bathroom, constructed a garage and a concrete driveway, added a utility room, replaced a kitchen door, improved the sidewalk, and painted the exterior and interior was sufficient to satisfy the partial-performance exception to the statute of frauds).

The Dallas Court of Appeals rejected a similar argument that the purchaser was required to submit evidence regarding the fair market value of the property in order to prove that improvements were made to the property were "valuable." *Beard,* 2015 WL 3823950, at *2. Rather, the court held that the "valuable-improvements" element of the partial-performance doctrine may be satisfied with evidence of expenditures beyond the mere payment of consideration such that the buyer would "suffer an additional and substantial out-of-pocket loss" if the seller is permitted to avoid the contract. *Id.* (citing *Cowden v. Bell,* 157 Tex. 44, 300 S.W.2d 286, 290 (1957)).

The Reyes Family provided sufficient evidence that they made substantial expenditures beyond the mere payment of consideration and that those improvements were valuable. This included evidence that they installed a chain link fence around the perimeter of the lot, built a shed, added rooms, installed plumbing fixtures, lighting, and ceramic tile, poured a concrete slab, and planted trees. They not only testified regarding the time and money

they personally spent to improve the property, but also provided pictures of the additions to the mobile home, and provided written documentation for some of the improvements, which included receipts totaling $1,050 for outside help, despite doing most of the work themselves. Evidence of similar improvements have been found sufficient to establish the value of improvements in order to meet the requirements of partial-performance exception. *See, e.g., Ratsavong,* 176 S.W.3d at 669 (appellees' oral testimony regarding the cost of improvements was sufficient to fulfill the requirement that he made valuable improvements to the property); *Eastland,* 196 S.W.2d at 338–39 (no "standard of minimum value" can be set in determining whether improvements were permanent and valuable, and no proof of monetary value is required to make that determination); *Kean v. Cotten,* 253 S.W.2d 61, 63 (Tex.Civ.App.–Beaumont 1952, no writ) ("There is no definite measure of how valuable such improvements must be in order that they be sufficient.").[9]

Burrus contends, however, that the improvements the Reyes Family made were neither valuable nor permanent, because many of the improvements were subsequently torn down and moved off the property after she sold the property to Tornillo DTP. In particular, she contends that the changes the Reyes Family made to the mobile home rendered the mobile home uninhabitable and unusable, and that the mobile home and its improvements had to be "dismantled" and taken off the property

in pieces. This argument fails for several reasons. First, the mobile home was rendered unusable only because the Reyes Family was forced to move the home off the lot as the result of Burrus's actions in selling the property to Tornillo DTP. As the result of Burrus's sale, Tornillo DTP destroyed many of the other improvements the Reyes Family had made on the property long before the Reyes Family agreed to move off the property as part of their settlement agreement with Tornillo DTP. [10] More importantly, merely because an improvement can subsequently be damaged or destroyed does not mean that improvement is any less valuable or permanent for purposes of establishing the partial-performance exception. If we were to accept Burrus's argument that the improvements made by the Reyes Family were neither valuable nor permanent merely because they were later destroyed, we would be required to conclude by perforce of logic that virtually no improvement could be considered permanent or valuable, since any improvement is subject to destruction. In our opinion, the fact that a man-made improvement is subject to future destruction makes it no less valuable or permanent.

And finally, we disagree with Burrus's contention that the evidence did not support the jury's finding that the improvements were made with her consent. To the contrary, Burrus admitted that she consented to the installation of the fence on the property, and that she was aware of the other improvements that the Reyes

---

9. In the cases cited by Burrus, the parties made only nominal changes to the property. *See, e.g., Fandey v. Lee,* 880 S.W.2d 164, 170 (Tex.App.–El Paso 1994, writ denied) (evidence that plaintiffs had telephone lines directed into the house and built in bookcases did not constitute permanent or valuable improvements to take case out of the statute of frauds).

10. Contrary to Burrus's argument, the Reyes Family was not able to salvage all of the building materials used in making the improvements, including the cement foundation that was poured to add the additional rooms to the mobile home.

Family made on the property during the approximately 17 years they lived on the property.[11] The jury could reasonably infer from this evidence that Burrus impliedly agreed to all the improvements made by the Reyes Family. *See, e.g., Ratsavong,* 176 S.W.3d at 669 (where sellers were aware of the improvements on the property made by purchaser, and never opposed them, the trial court could infer that the sellers impliedly consented to the improvements). Accordingly, we conclude that the evidence was factually sufficient to support the jury's finding that the Reyes Family made valuable and permanent improvements to the property with Burrus's consent, and that the parties' oral agreement was enforceable under the partial-performance exception to the statute of frauds.[12]

### The Essential Elements of the Contract

Burrus next contends the trial court should have determined as a matter of law that the oral agreement was unenforceable because the essential terms of the parties' agreement were ambiguous or there was no evidence that there was a meeting of the minds on the essential terms of the agreement. Burrus contends that accordingly the trial court should not have submitted the question to the jury whether the parties reached an oral agreement.[13] The Reyes Family contends that Burrus has waived this issue, and alternatively that the evidence was sufficient to establish the existence of an enforceable contract. Although we disagree that Burrus

waived this issue, we conclude the trial court did not err in submitting the contract formation issue to the jury.

### *Waiver*

■ Burrus timely made a written objection to submitting the "contract issue" to the jury. In her objection, Burrus argued that whether a contract is enforceable is a question of law for the court that should not be submitted to the jury when the trial court determines that the terms of the alleged contract are "too indefinite for the court to determine the parties' legal obligations and liabilities" as a matter of law. The Reyes Family argues this objection did not inform the trial court of the basis of Burrus's objection because it argued only a general principle of law without explaining how that principle applied to the facts of this case. They contend the issue was therefore not preserved for appeal, citing *Burbage v. Burbage,* 447 S.W.3d 249 (Tex. 2014), in which the Supreme Court held that in order to raise a jury charge complaint on appeal, the complaining party must "point out distinctly the objectionable matter and the grounds of the objection." *Id.* at 256 (citing Tex. R. Civ. P. 274); *see also* Tex. R. App. P. 33.1. The Court in *Burbage* concluded, however, that the test ultimately asks "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Id.* (quoting *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex. 1992)).

---

11. It is irrelevant that Burrus testified that she consented to the installation of the fence only because she believed the Reyes Family had requested it for the safety of their children. The fact remains that she knowingly allowed the Reyes Family to install the fence.

12. In light of our conclusion, we need not consider whether the evidence supports the alternative basis for partial performance, *i.e.,*

that the transaction would otherwise work a fraud on the Reyes Family if the oral contract were not enforced.

13. The trial court submitted the following question to the jury: "Did David Reyes and Sonia Valenzuela and Annette Burrus orally agree to the sale of a mobile home and lot located at 18990 Alameda Ave. Tornillo, Texas?"

■ Although Burrus's written objection may have lacked specificity, she clarified her objection in arguing her motion for directed verdict, providing specific details to the trial court regarding why she believed the Reyes Family had not presented sufficient evidence to present the contract issue to the jury. In particular, Burrus argued that the evidence did not demonstrate that there was a "meeting of the minds" on various terms of the alleged purchase agreement, including the exact boundaries of the purchased property, the interest rate and maturity date of the loan, and who would pay the property taxes. In doing so, Burrus specifically referenced her written objection to the jury charge. Although the trial court did not specifically address the issue at the charge conference, the court stated that it was denying all of Burrus's objections without exception, thereby impliedly denying Burrus's objection to submitting the contract issue to the jury. Under these circumstances, we conclude that Burrus has preserved error because she "made the trial court aware of the complaint, timely and plainly, and obtained a ruling."[14] *Burbage,* 447 S.W.3d at 256.

### *Applicable Law and Standard of Review*

■ A party must establish a meeting of the minds to prove the existence of an enforceable contract. *See Southern v. Goetting,* 353 S.W.3d 295, 299 (Tex.App.–El Paso 2011, pet. denied) (citing *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 635 (Tex. 2007)); *see also David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex. 2008).

Further, whether an agreement is oral or written, the terms of the agreement must be definite, certain, and clear as to all essential terms. *Goetting,* 353 S.W.3d at 299–301. When essential terms are missing from the parties' agreement, the parties have, at most, only entered into an agreement to make a future agreement, with the essential terms left open to future negotiations, which, in turn, cannot constitute a binding contract. *Id.*; *see also T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992).

■ Prior to submitting a contract issue to the jury, the trial court must determine, as a matter of law, whether all essential terms have been included in the contract. *Goetting,* 353 S.W.3d at 300 (citing *E.P. Towne Ctr. Partners v. Chopsticks, Inc.,* 242 S.W.3d 117, 122 (Tex.App.–El Paso 2007, no pet.) (the question of whether an agreement fails for lack of an essential term is a question of law for the court to determine)); *see In re D. Wilson Const. Co.,* 196 S.W.3d 774, 781 (Tex. 2006) (whether a contract is ambiguous is a question of law that the trial court must determine); *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex. 1983) (whether a contract is too ambiguous to be enforceable is a question of law for a court to decide). However, as the Supreme Court has recognized, the trial court need not make an express finding that a contract is unambiguous and therefore enforceable, and a reviewing court may determine that by submitting a contract formation question to the jury, the trial court made an implicit finding on that issue. *See, e.g., Exxon*

14. We also reject the argument that Burrus has waived error because she didn't reurge her motion for directed verdict at the close of all the evidence or raise it in a post-judgment motion. Burrus is not arguing the trial court erred in denying her motion for directed verdict. She is arguing the trial court erred in submitting the contract issue to the jury. A no evidence challenge can be preserved in five different ways, one of which is an objection to the submission of the issue to the jury. *See Southern v. Goetting,* 353 S.W.3d 295, 298 (Tex. App.–El Paso 2011, pet. denied).

*Corp. v. W. Texas Gathering Co.,* 868 S.W.2d 299, 302 (Tex. 1993) (while the trial court never made an express finding that a contract was unambiguous, that determination was necessary before the trial court submitted the question of the parties' intent to the jury).

### Analysis

The trial court submitted a question to the jury regarding whether the parties intended to enter into an agreement to sell the property. Accordingly, we conclude that the trial court impliedly determined that the parties had a meeting of the minds as to all essential terms in the contract, and that the contract was therefore unambiguous and enforceable. Burrus contends, however, that the trial court erred in making this implied determination. In particular, Burrus argues there was no evidence that the parties had a meeting of the minds on the essential terms of the agreement because the parties did not agree on the property's exact boundaries, the interest rate or maturity date on the loan, or who was responsible for paying the property taxes. Although Burrus argues that these four terms were essential to the agreement, she cites no cases in support of her argument.[15]

Not all terms in a parties' agreement are considered essential. Essential or material terms are only those the parties "would reasonably regard as vitally important elements of their bar-

gain." *See Kanan v. Plantation Homeowner's Ass'n Inc.,* 407 S.W.3d 320, 330 (Tex.App.–Corpus Christi 2013, no pet.); *see also Goetting,* 353 S.W.3d at 300 (citing *Domingo v. Mitchell,* 257 S.W.3d 34, 40–41 (Tex.App.–Amarillo 2008, pet. denied)) ("A promise or term is an essential part of an agreement if, when contracting, the parties would reasonably regard it as a vitally important element of the bargain."). Whether a term is an essential element of a contract depends primarily upon the intent of the parties. *Kanan,* 407 S.W.3d at 330. Further, Texas law confers upon the parties the ability to agree to leave non-essential matters open for later negotiation. *McCulley Fine Arts Gallery, Inc. v. X Partners,* 860 S.W.2d 473, 477 (Tex.App.–El Paso 1993, no writ). A contract fails only when an essential term is left open for future negotiations. *Id.* Thus, if the parties agree on the essential terms of a contract, the agreement may leave other non-essential provisions open for future adjustment and agreement. *Kanan,* 407 S.W.3d at 330 (citing *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 555 (Tex. 1972)). If the evidence supports an inference that the parties intended to conclude a bargain, the agreement's silence as to non-essential, or collateral, matters is not fatal. *E.P. Towne Center Partners, L.P.,* 242 S.W.3d at 122; *see also Scott,* 489 S.W.2d at 556 ("Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they

---

**15.** Instead, Burrus relies primarily on the testimony of the Reyes Family's witness, Assistant County Attorney Erich Morales, who she claims testified that an agreement to purchase land would not be enforceable if the parties failed to agree on such terms as the interest rate, maturity date, or a property description. Morales's testimony, however, was not that broad or all-encompassing. Instead, he testified that if the parties did not agree on those particular items, there would be no meeting of the minds as to those *specific* terms. He did not express any opinion whether the failure to agree on those particular terms would render an agreement unenforceable. In any event, a court is not bound by the testimony of an expert witness on legal issues. *See Boulle v. Boulle,* 254 S.W.3d 701, 707–08 (Tex.App.–Dallas 2008, no pet.) (expert opinion on parties' intended meaning of their contract properly excluded as irrelevant).

expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract."). Whether a term is material to a particular contract should be "determined on an agreement-by-agreement basis." *Vermont Info. Processing, Inc. v. Montana Beverage Corp.*, 227 S.W.3d 846, 852 (Tex.App.–El Paso 2007, no pet.) (quoting *T.O. Stanley Boot Co.*, 847 S.W.2d at 221).

 Burrus correctly points out that in a real estate sales contract, the property to be conveyed is generally considered to be an essential term of the contract and that a description of the land to be conveyed is considered essential to its enforceability. *See, e.g., Loeffler v. Lytle Ind. Sch. Dist.*, 211 S.W.3d 331, 346 (Tex. App.–San Antonio 2006, pet. denied) (holding that a contract to sell real property was unenforceable because it did not contain a sufficient description of land subject to contract); *Joplin v. Nystel*, 212 S.W.2d 869, 872 (Tex.Civ.App.–Amarillo 1948, no writ) (draft sales agreement that provided only a "partial description of the land" was unenforceable). Further, when a contract is in writing, the statute of frauds requires an adequate property description in the contract itself that allows the property to be identified with "reasonable certainty." *See, e.g., Texas Builders v. Keller*, 928 S.W.2d 479, 482 (Tex. 1996); *Kanan*, 407 S.W.3d at 330–31.

 In the present case, however, we are not faced with construing the terms of a *written* agreement but rather with construing the parties' *intent* in entering into an oral agreement—an agreement that is considered to be enforceable based on the partial performance exception to the statute of frauds. In this case, it is "the performance must supply the key to what was promised." *See Elizondo v. Gomez*, 957 S.W.2d 862, 864 (Tex.App.–San Antonio

1997, pet. denied) (citing *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex.App.–Texarkana 1989, no writ)). Further, even when a written agreement is not entirely clear with regard to a property description, if the purchaser goes into possession of the property and remains in possession for several years without objection by the seller, there can be "no question but that this was the property intended to be conveyed." *Libby v. Noel*, 581 S.W.2d 761, 764 (Tex.Civ.App.–El Paso 1979, writ ref'd n.r.e.).

Burrus correctly points out that the Reyes Family acknowledged that when the parties first began negotiating for the sale of the property, they did not agree on the exact property to be purchased and did not know the exact boundaries of the property they were purchasing. The Reyes Family admitted that initially they did not know which particular half-acre lot they were purchasing from Burrus and that in essence they were allowing Burrus to select the lot to be purchased. If those were the only facts before us, we might be persuaded that the parties did not reach an agreement on the property that was the subject of the sale. However, our review of the record reveals that the parties did in fact agree on the property description, as revealed by their actions in performing the contract.

 First, the Reyes Family did not "accept" the actual agreement to purchase the property until *after* Burrus had the mobile home moved to the lot, and *after* Burrus gave them the address to the property. By that time, the Family had driven by the property located at the address and had viewed the mobile home on the lot itself, allowing them to determine the location of the property they were purchasing. Provision and knowledge of the address to the property was clear evidence that both parties knew exactly what

property was the subject of their agreement, and provided an objective, verifiable method of determining the boundaries of that property.[16] *See, e.g., Libby,* 581 S.W.2d at 763–64 (the reference to a property address in the parties' contract may be in itself sufficient since the evidence is that there was no other house or home on that property). Further, there can be no doubt that Burrus herself knew exactly what she was conveying to the Reyes Family when she provided them with that address, since the evidence indicated that the half-acre lot had been previously surveyed by an engineer hired by Burrus in March 1994, who had planted rebar stakes marking the boundaries before the Reyes Family moved onto the property.[17]

More importantly, the Reyes Family learned the exact dimensions of their lot in early 1995 a few months after they moved onto the property, when they notified Burrus about their desire to erect a chain link fence around the perimeter of the half-acre lot, and Burrus sent her father to the property to assist them with locating stakes that the surveyor had placed on the property in 1994 to demarcate the half-acre lot. And, after locating the boundary, the Reyes Family erected the fence demarcating the half-acre boundary of the lot, with Burrus's express consent, and remained on the property for sixteen years

thereafter without disruption. Moreover, the surveyor hired by the Reyes Family in April 2012 confirmed that the fenced area corresponded with the address that Burrus provided and that his survey corresponded with the rebar stakes from the prior survey conducted on the property. Under these circumstances, we conclude that both parties clearly understood and agreed upon the property that was the subject of their contract.

As to the remaining terms, Burrus is correct that the Reyes Family acknowledged that when they entered into their oral agreement, they did not have a clear agreement on whether the payments included any interest on the loan, and that they simply assumed that Burrus would be taking money out of their monthly payments to pay for the property taxes. In addition, they testified they were not certain of the exact date on which their loan would be paid off—only that they believed Burrus would keep track of the payments and let them know when the loan was paid in full, at which time they expected Burrus would transfer the title to them.

We conclude, as many of our sisters courts have, that terms of this nature are not essential to the formation of the parties' contract. *See, e.g., Penwell v. Barrett,* 724 S.W.2d 902, 906 (Tex.App.–San Anto-

---

16. At trial, Burrus apparently found it significant that the Reyes Family did not know the exact metes and bounds description of the property at the time of their acceptance of the contract. We do not find this to be fatal to the parties' agreement, because even a written agreement need not contain a technical metes and bounds description to be enforceable. *See, e.g., Texas Builders,* 928 S.W.2d at 482 (citing *Morrow v. Shotwell,* 477 S.W.2d 538, 539 (Tex. 1972)).

17. In her reply brief, Burrus appears to argue that the address she provided to the Reyes Family covered more than just the half acre that the Reyes Family occupied, and instead

encompassed all of Tract 11A on which the Reyes Family's half acre was located. In support of her argument, she attaches two exhibits to her brief that were not part of the appellate record. We cannot consider exhibits outside the appellate record. *See, e.g., Hogg v. Lynch, Chappell & Alsup, P.C.,* 480 S.W.3d 767, 773 (Tex.App.–El Paso 2015, no pet.) ("Documents attached to a brief as an exhibit or appendix, but not appearing in the appellate record, cannot be considered on appellate review."). Regardless, the evidence presented at trial indicated that the address encompassed only the half acre the Reyes Family fenced and occupied.

nio 1987, no writ) (noting that in the context of a contract to sell real property, neither term of loan nor interest rate is an essential term, regardless of whether the contract is in writing or oral); *see also Smith v. Nash*, 571 S.W.2d 372, 375 (Tex. Civ.App.–Texarkana 1978, no writ) (observing that because law implies reasonable time for performance, time for performance is not an essential term); *Ozlat v. Nguyen*, No. 01-97-00568-CV, 1998 WL 255142, at *2 (Tex.App.–Houston [1st Dist.] May 21, 1998, no pet.) (contract was enforceable despite failure of parties to agree on financing terms, allocation of sales expenses to be paid at closing, or a closing date); *McCulley Fine Arts Gallery, Inc.*, 860 S.W.2d at 477–78 (the questions regarding who would pay taxes or insurance for a sales contract were not essential terms of the contract); *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 869 (Tex.App.–Tyler 2010, pet. denied) ("terms and provisions applicable to the payment of the balance of the purchase price [were] not essential terms to the overall sale of the property"). Instead, such terms are questions of "form and not the substance of the transaction," and the parties are free to leave those terms open to subsequent negotiations. Consequently, the failure to agree on those terms does not render the contract unenforceable if the parties otherwise agree on the essential terms of the contract. *McCulley Fine Arts Gallery*, 860 S.W.2d at 478; *see also Thedford Crossing, L.P.*, 306 S.W.3d at 868–69. Accordingly, we conclude that the trial court correctly determined that the parties entered into an enforceable contract despite any failure to agree on these non-essential terms.

### Burrus Waived Error Concerning Submission of the Contract Formation Question

Burrus contends the trial court erred in submitting the contract formation question to the jury without including an instruction apprising them of the "elements of an enforceable contact," which she believes was necessary to guide the jury in its deliberations. It appears that Burrus is arguing that the trial court should have instructed the jury that they were required to find all five elements of a contract (offer, acceptance, meeting of the minds, execution and delivery of the contract, and consideration) before they could determine that the parties entered into a valid contract. Burrus believes that without such an instruction, the jury was left with no guidance regarding how to determine whether the parties actually intended to enter into a contact. Burrus has waived this issue.

The Rules of Civil Procedure expressly provide that the failure to submit a definition or instruction to the jury cannot be deemed a ground for reversal unless a substantially correct definition has been requested in writing and tendered by the party complaining of the judgment. Tex. R. Civ. P. 278; *see State v. Harrington*, 407 S.W.2d 467, 479 (Tex. 1966); *Shelby Distributions, Inc. v. Reta*, 441 S.W.3d 715, 720 (Tex.App.–El Paso 2014, no pet.) (party waived error in charge by failing to request and tender a substantially correct instruction to the trial court). We recognize that Burrus submitted a handwritten document to the trial court entitled "jury charge comments" stating that she would "like to include the elements for a contract" in the jury charge, but she did not specify what elements she meant by that request and further failed to tender a proposed jury instruction to that effect. Instead, the only proposed jury instruction Burrus submitted quoted three basic propositions of law, none of which referred to

the five elements of a contract.[18] The first proposed that an oral agreement may be established by direct or circumstantial evidence, which was already covered by the jury's charge in the general instructions, and informed the jury that any fact the parties sought to prove could be established by "direct evidence or by circumstantial evidence or both." Further, the remaining two propositions are inapplicable to the present case, because this case did not involve a written contract and the Reyes Family was not seeking specific performance.

Moreover, during the charge conference, Burrus's attorney asked the trial court to include what was "required to have an enforceable contract," but never made it clear that he was requesting the court to instruct the jury on the elements of a contract, and instead focused primarily on the requirements for finding the partial-performance exception to the statute of frauds. Further, at some point during their discussion, Burrus's attorney stated that the jury charge, as given, was "exactly what we were asking for[.]" Accordingly, we conclude that Burrus has waived any error that the trial court failed to include an instruction on the five elements of a contract.[19]

## The Evidence Supported the Finding that the Parties Intended to Enter into an Oral Agreement

█ It appears that Burrus is also arguing that the jury's finding that the parties intended to enter into an oral agreement to purchase the property was not supported by factually-sufficient evidence. In resolving this issue, we apply the same standard of review as discussed above, and review the record in its entirety to determine whether the jury's verdict if it is so

---

**18.** Burrus's proposed instructions stated:

ESSENTIAL TERMS FOR AN ORAL CONTRACT FOR SALE
The terms of an oral agreement may be established by direct or circumstantial evidence. *Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex. App.–San Antonio 2000).
A court cannot find specific performance "when there is confusion and indefiniteness as to the terms" of an oral contract for deed. *Francis v. Thomas*, 129 Tex. 579, 106 S.W.2d 257, 258 (1937)[.]
A written contract for sale of real estate is inoperative and void if it does not describe the land in such a way as to identify it with reasonable certainty. *Yarto v. Gilliland*, 287 S.W.3d 83, 96 (Tex.App.–Corpus Christi 2009, no pet.)[.]

**19.** In any event, our sister courts have approved virtually identical jury questions as submitted by the trial court here, which ask the jury to determine whether the parties intended to enter into a purchase agreement, without listing the elements of the contract. *See Calce v. Dorado Expl., Inc.*, 309 S.W.3d 719, 734 (Tex.App.–Dallas 2010, no pet.); *see also Penwell v. Barrett*, 724 S.W.2d 902, 904–05 (Tex.App.–San Antonio 1987, no writ) (trial court properly submitted special issues to the jury regarding whether the parties intended to enter into a sales agreement, as asserted by the plaintiffs, or a rental agreement, as asserted by the defendant); *Thomas v. Miller*, 500 S.W.3d 601, 610 (Tex.App.–Texarkana 2016, no pet.) (jury's finding that the parties had entered into an oral agreement for the sale of property, as opposed to a rental agreement, was supported by legally and factually sufficient evidence). Moreover, the instructions are sufficient when, as here, they properly guide the jurors by cautioning them to determine the parties' intent based on what the parties said and did in light of the surrounding circumstances, including any earlier course of dealing, and that they cannot consider the parties' unexpressed thoughts or intentions. *See, e.g., Calce.*, 309 S.W.3d at 734 (approving similar instruction); *Malone v. Patel*, 397 S.W.3d 658, 667 (Tex.App.–Houston [1st Dist.] 2012, pet. denied) (same); *Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 437 (Tex.App.–Houston [14th Dist.] 2016, no. pet. h.) (same). Accordingly, because the trial court provided these same instructions to the jury, we conclude the trial court properly submitted the contract formation question to the jury and provided the jury with sufficient guidance in making that determination.

contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust, construing the evidence in the light most favorable to the jury's verdict. *See Baker*, 172 S.W.3d at 87.

Our review of the record reveals that, at most, the evidence was conflicting with respect to the parties' intent. While Burrus testified that she believed the parties were entering into a rental agreement, the Reyes Family testified they believed they were entering into a purchase agreement. Further, the remaining evidence was primarily consistent with the finding that the parties agreed to a purchase agreement. For example, Burrus's own conduct was not that of a landlord. The undisputed evidence revealed that Burrus did not have a key to the property and that she never came onto the property during the entire 17 years that the Reyes Family lived there, even after the mobile home was damaged in the fire. Further, the Reyes Family made significant improvements on the property and paid for all the repairs on the property during the 17 years they lived there, which was consistent with their status as purchasers rather than renters. While the jury was free to conclude otherwise, these facts were factually sufficient to support the jury's verdict. *See Thomas,*

500 S.W.3d at 610 (jury's finding that parties agreed to a purchase agreement, rather than a rental agreement, was supported by legally and factually sufficient evidence); *cf. Arredondo v. Mora*, 340 S.W.2d 322, 324 (Tex.Civ.App.–El Paso 1960, writ ref'd n.r.e.) (trial court's finding that the parties had agreed to a rental agreement was consistent with the manner in which the appellant possessed the property and the nature of the improvements made on the premises).[20]

### Statute of Limitations

■ Burrus contends that the Reyes Family's statutory fraud claim was barred by the statute of limitations. We conclude Burrus has waived this issue.

■ Because limitations is an affirmative defense, Burrus had the burden to plead, prove, and secure findings to sustain her plea of limitations. *City of Justin v. Rimrock Enterprises, Inc.*, 466 S.W.3d 269, 278–79 (Tex.App.–Fort Worth 2015, pet. denied); *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 325 (Tex.App.–Houston [1st Dist.] 2011, no pet.) (op. on reh'g); *Prestige Ford Garland Ltd. P'ship v. Morales*, 336 S.W.3d 833, 836 (Tex.App.–Dallas 2011, no pet.). This burden includes establishing when the cause of action ac-

---

20. In her reply brief, Burrus contends that it would have been "legally impossible" for her to sell the property to the Reyes Family, since she believed the half-acre lot could not be conveyed without being properly subdivided in accordance with unspecified county and state regulations. Her argument in part appears to be based on her mistaken impression that the law required her to file a "plat" with the county before subdividing and selling a portion of her tract. At trial, however, the assistant county attorney testified that when the Reyes Family took possession of the property in 1994, the laws in effect allowed a seller to convey a lot that faced an existing road—as the lot in this case did—without filing a plat with the county. Burrus cites no authority to the contrary. More importantly,

Burrus's alleged inability to legally sell the property would have only prohibited the Reyes Family from seeking specific performance of the agreement, and would not have prohibited them from seeking damages for her breach of the oral agreement. *See Manley v. Holt*, 161 S.W.2d 857, 859 (Tex.Civ.App.–Amarillo 1942, writ ref'd w.o.m.) ("The law is well settled that, in a proper case, damages for breach of a contract of sale may be recovered in the alternative when it is shown that specific performance is not possible."); *see also Paciwest, Inc. v. Warner Alan Properties, LLC*, 266 S.W.3d 559, 575 (Tex.App.–Fort Worth 2008, pet. denied) ("The general rule is that damages constitute an alternative remedy available only when specific performance either is not sought or is not available.").

crued to demonstrate the bar of limitations. *City of Justin*, 466 S.W.3d at 278–79; *Prestige Ford*, 336 S.W.3d at 836. While Burrus pled limitations, she did not submit a jury question or obtain a jury finding on limitations. When the jury is not asked to determine when the cause of action accrued for purposes of supporting a limitations defense, the defense is waived unless the accrual date is conclusively established by the evidence. *City of Justin*, 466 S.W.3d at 278–79; TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.").

■ A statutory claim for fraud in real estate under Section 27.01 must be brought within four years of when the fraud was or should have been discovered by reasonable diligence. *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007) (citing Section 16.004). The date that a claimant knew or should have known of an injury is generally a fact question. *See NETCO, Inc. v. Montemayor*, 352 S.W.3d 733, 738 (Tex.App.–Houston [1st Dist.] 2011, no pet.) (citing *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998)). However, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, the start of the limitations period may be determined as a matter of law. *Id.* Accordingly, Burrus's claim that the statutory fraud cause of action was barred by limitations is waived unless the record demonstrates as a matter of law that the statute of limitations began accruing before April 5, 2008, four years before suit was filed on April 5, 2012.

Without actual knowledge, the earliest date the Reyes Family could have discovered any fraud was the date the mortgage had been paid in full and Burrus refused to transfer the deed.[21] *See Ratsavong*, 176 S.W.3d at 670. Burrus claims that the statute of limitations began to run when the Reyes Family had paid the total amount owed under the agreement ($21,000), arguing that once that amount was paid and Burrus failed to provide title to the property as contemplated by the agreement, the Reyes Family would have, or should have, been on notice that they had been defrauded.[22] She then contends that, based on her calculations, the Reyes Family paid a total of $21,000 in June 2006, based on the initial payments of $185 a month beginning in September 1994 and payments of $200 a month starting in January 1995. According to Burrus's reasoning, the Reyes Family only had until June 2010 to file their lawsuit, meaning that limitations expired almost two years before they filed their petition on April 5, 2012.

On the other hand, the Reyes Family points out that the record is not clear when they paid off the loan, noting that the record reflects that they admittedly missed several payments, and took out at least two additional loans from Burrus that they were obligated to repay, for which Burrus failed to account. Further, the Reyes Family points out that Burrus had informed them that she intended to take money from their monthly payments to

---

**21.** Burrus does not claim that the Reyes Family had actual knowledge of her alleged fraud before February 2012 when she advised them she had sold the property to Tornillo DTP.

**22.** Burrus also makes a passing reference in her brief that the Reyes Family knew they were not the "registered" owners of the prop-

erty during the 17 years they resided there. As discussed above, however, in a contract for deed transaction, a purchaser does not receive the title, and thus would not have expected to receive title, until the entire loan is paid off.

pay for insurance on the property, and that it was unclear whether she had also taken out money to pay the property taxes or for interest on the loan. Based on their calculations, the Reyes Family did not pay off their debt to Burrus until February 2009, meaning that they timely filed their lawsuit within the four year statute of limitations in April 2012.

Accordingly, we conclude that a factual dispute existed regarding when the Reyes Family could have demanded title from Burrus, and consequently when they should have discovered Burrus's fraud, and that therefore the record fails to show as a matter of law that the statute of limitations expired before the Reyes Family filed their petition. Burrus was thus required to submit this factual dispute to the jury but failed to do so. Consequently, Burrus waived her right to raise her limitations issue on appeal.

### Failure To Provide An Accounting

Section 5.077 of the Texas Property Code provides that a seller who sells property through an executory contract, such as a contract for deed, must provide the purchaser with an annual accounting statement that provides information regarding the amounts paid and the remaining amounts owed. TEX. PROP. CODE ANN. § 5.077(a) (West Supp. 2016). The statute allows the purchaser to recover liquidated damages for the failure to provide an annual accounting based on how many "transactions" the seller engages in "under this section" in a 12–month period. In particular, the statute provides that a seller who "conducts less than two transactions in a 12–month period under this section," is liable to the purchaser for liquidated damages in the amount of $100 for each annual statement the seller fails to provide (together with reasonable attorney's fees), while a seller who "conducts two or more transactions in a 12–month period under this section" is liable to the purchaser for $250 a day in liquidated damages (together with reasonable attorney's fees). *Id.* at § 5.077(c), (d) (West Supp. 2016).

Burrus contends that the jury's finding that she had engaged in "two transactions" involving a contract for deed within a 12–month period was not supported by legally or factually sufficient evidence, and that accordingly the Reyes Family was not entitled to the $23,240 in liquidated damages the trial court awarded pursuant to Section 5.077(d)(1) of the Property Code.[23] We disagree.

---

23. When confronted with both a legal and a factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). When addressing a challenge to the legal sufficiency of the evidence to support the jury's findings, we review the entire record, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Telesis/Parkwood Ret. I, Ltd.*, 462 S.W.3d at 222. We sustain a legal sufficiency challenge when, among other things, the offered evidence to establish a vital fact does not exceed a scintilla. *Id.* (citing *Kroger v. Texas Ltd. P'ship*, 216 S.W.3d 788, 793 (Tex. 2006)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Id.* (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010)); *see also Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996) (anything more than a scintilla of evidence is legally sufficient to support the jury's finding). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *Telesis/Parkwood Ret. I, Ltd.*, 462 S.W.3d at 222 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). As discussed above, we review a challenge to the factual sufficiency of the evidence in a more lenient manner, and will set aside a jury's finding only if, after considering and

As evidence of a "second transaction" within 12 months of their purchase, the Reyes Family presented the deposition testimony of Veronica Archuleta, who testified that she and her then-husband had also purchased property from Burrus in May 1994. She testified that they had entered into an oral agreement with Burrus similar to the Reyes Family's oral agreement, in which Burrus agreed to purchase a mobile home of their choice that she would have moved to a lot, after which Burrus would provide them with a seller-financed mortgage in which they would pay $800 down and $200 a month, to include interest and property tax payments, until they had paid the purchase price of $25,000. Burrus was to then transfer the title to them for both the mobile home and the land. Archuleta testified that Burrus never sent them any receipts or statements showing how much they had paid and how much they owed on the property.

Burrus does not deny that her oral agreement with the Reyes Family could be categorized as an executory contract for purposes of Section 5.077 of the Code, and we conclude that the parties' agreement was in fact an executory contract because their agreement contemplated that title would not pass to the Reyes Family until they had paid Burrus in full for the purchase. *See, e.g., Smith v. Davis,* 462 S.W.3d 604, 609 (Tex.App.–Tyler 2015, pet. denied) (contract that allows the seller to retain title to the property until the purchaser has paid for the property in full is clearly an executory contract under the statute) (citing *Morton v. Nguyen,* 412 S.W.3d at 509–10). Nor does Burrus deny that she failed to provide an annual accounting to the Reyes Family during the

17 years that they occupied the property, contending that she did not do so because they were renters and not purchasers.

Burrus contends, however, that the Reyes Family was not entitled to invoke the liquidated damages provision in the Code because their contract was not in writing, pointing out that the current version of the Property Code expressly states that executory contracts are not enforceable unless in writing. TEX. PROP. CODE ANN. § 5.072(a) (West 2014). This prohibition, however, was added to the Property Code in 2001 and was expressly made applicable only to contracts entered into on or after September 1, 2001, and thus was not in effect at the time that the Reyes Family entered into their executory contract. *See* 77th Legislature, 2001 TEX. SESS. LAW SERV. Ch. 693 § 3(e) (S.B. 198 enacted May 18, 2001). Because the Reyes Family's contract—as well as the Archuleta contract—were both entered into before September 1, 2001, the prohibition in Section 5.072(a) has no relevance to the present case.

Burrus contends that even if the statutory prohibition against oral contracts in the Property Code does not apply, the jury still was not entitled to rely on the Archuleta contract as her "second transaction" within a 12–month period, because the Reyes Family did not establish that Archuleta's oral agreement was enforceable under an exception to the general statute of frauds. Burrus notes that Archuleta never testified concerning any improvements she and her husband had made on the property that would have established the partial-performance exception to the statute of frauds. The Reyes Family argues that they were not obligated to establish that the Archuleta contract

---

weighing all of the evidence in the record pertinent to that finding, we find that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming

weight of all of the evidence, that the answer should be set aside and a new trial ordered. *See Crosstex N. Texas Pipeline, L.P.,* 505 S.W.3d at 615.

was enforceable—only that the contract existed—pointing out that under the statute of frauds, an oral contract to purchase real estate is not void, only voidable. *See, e.g., Scott v. Vandor,* 671 S.W.2d 79, 88 (Tex.App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.). In essence, Burrus contends that the Legislature intended to include only enforceable contracts for deed in determining the number of transactions within a 12–month period, while the Reyes Family contends that no such requirement is imposed by the Code. This requires us to determine the legislative intent behind the liquidated damages provision.

A statute's meaning is a question of law we review de novo. *LTTS Charter Sch., Inc. v. C2 Constr., Inc.,* 342 S.W.3d 73, 75 (Tex. 2011). Likewise, whether a contract comes within a statute is a question of law that we review de novo. *See Dynegy, Inc. v. Yates,* 422 S.W.3d 638, 642 (Tex. 2013). In construing a statute, we look for the Legislature's expressed intent, which ordinarily is found in the words used in the statute. *LTTS Charter Sch., Inc.,* 342 S.W.3d at 75. We give unambiguous text its ordinary meaning, aided by the interpretive context provided by "the surrounding statutory landscape." *Id.* (quoting *Presidio Ind. Sch. Dist. v. Scott,* 309 S.W.3d 927, 929–30 (Tex. 2010)).

The Property Code specifically states only that daily liquidated damages may be awarded when the seller has "conducted two or more transactions under this section," and it does not state what it intended by those terms. Obviously from the context, the "transactions" in question must involve situations in which a seller sells the properties utilizing a contract for deed, which Burrus did with both Archuleta and the Reyes Family. What is less clear is whether the Legislature intended that a purchaser would be required to prove that the executory contract for deed was enforceable in order to recover the daily liquidated damages. In deciding this issue, we note that the Legislature could have, but did not, impose any such express requirement when it adopted Section 5.077. *See Lippincott v. Whisenhunt,* 462 S.W.3d 507, 509 (Tex. 2015) (recognizing that if the Legislature had intended to limit the scope of the Texas Citizens Participation Act to publicly communicated speech, it could have easily added language to that effect, but, by the plain language of the statute, it chose not to).

Further, when we consider the Legislature's intent in adopting this Section 5.077, we do not believe that the Legislature intended to impose any such requirement. In particular, we note that Section 5.077 was adopted as part of a 1995 Act in which the Legislature sought to address the problems inherent in colonias. Among other things, the Legislature recognized that many sellers in these economically distressed areas utilized contracts for deeds, which were essentially unregulated at that time. *See* Legislative Statement, 1995 TEX. SESS. LAW SERV. Ch. 994 (S.B. 336). As part of its efforts to regulate this area of the law, the Legislature required sellers utilizing contracts for deed in these areas to provide an annual accounting statement to the purchaser in January of each year. *Id.* Although the Legislature subsequently made changes to the penalties that apply when a seller fails to provide an annual accounting, the intent remains the same—to protect unsophisticated buyers in economically distressed areas from overreaching sellers. One of the worst forms of overreaching in these situations is when a seller offers a purchaser an oral contract for deed that may in fact be voidable and unenforceable. As such, we conclude that the Legislature intended to include voidable contracts for

deed, such as the contract that Archuleta entered into with Burrus, when it enacted the liquidated damages provision in question. Accordingly, we conclude that the trial court properly determined that the Reyes Family was entitled to liquidated damages of $250 a day pursuant to Section 5.077(d).

## Money Had and Received

In her last issue, Burrus contends the evidence was legally and factually insufficient to support the jury's finding that she had received money that in equity and good conscience belonged to the Reyes Family. This "money had and received" claim was based on the Reyes Family's contention that they were entitled to a proportionate share of the $83,000 in profit Burrus received on the sale of the land to Tornillo DTP. Money had and received is an equitable action that may be maintained to prevent unjust enrichment when one person obtains money which in equity and good conscience belongs to another. *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 507 (Tex.App.–Fort Worth 2012, no pet.). A cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action" and "aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which ... belongs to the plaintiff." *Ardinger*, 369 S.W.3d at 507 (quoting *Staats v. Miller*, 150 Tex. 581, 584, 243 S.W.2d 686, 687 (1951)).

Burrus contends that any money she obtained from the sale of the property to Tornillo DTP did not belong to the Reyes Family because there was no valid and enforceable contract for deed and the Reyes Family therefore had no ownership interest in the property. We reject this argument because, as we have already concluded, the trial court properly determined that the parties had an enforceable contract for deed.

In the alternative, Burrus contends the Reyes Family had already received all of the money they were entitled to from the sale of the property in the form of the $64,600 settlement payment from Tornillo DTP. Burrus points out that in exchange for the settlement payment, the Reyes Family conveyed a deed without warranty for their property to Tornillo DTP, and that Sonia Valenzuela testified at deposition that she believed the settlement with Tornillo DTP was compensation for the sale of the property, expressly stating that it was not for "damages." The Reyes Family, however, did not sue Tornillo DTP for the value of the property. They sued for the intentional tort of trespass, seeking damages for DTP's actions in coming onto their property, destroying their property, and attempting to evict them. Moreover, at trial the Reyes Family produced a list of damages they had sought from DTP in their settlement negotiations, which included moving expenses, as well as costs associated with purchasing a new lot and mobile home. Significantly, they did not include on that list compensation for the sale of the property itself. The jury was free to resolve any conflicts or inconsistencies between this evidence and Sonia Valenzuela's deposition testimony. *See Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex. 1972) ("It is an old and familiar rule that the fact finder may resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses."). This credibility determination was reasonable, considering Sonia Valenzuela's lack of sophistication and the conclusory nature of her testimony on what was essentially a legal issue.[24] *See City of Keller*, 168 S.W.3d

---

24. Sonia Valenzuela had a 9th grade education, a limited understanding of English,

at 820 (noting that a jury's decisions regarding credibility must be reasonable).

Finally, Burrus contends that the $24,000 the jury awarded to the Reyes Family for money had and received represented compensation for the same injuries as the $22,802 the jury awarded for statutory fraud, making it an impermissible double recovery. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184–85 (Tex. 1998) ("A double recovery exists when a plaintiff obtains more than one recovery for the same injury."). We disagree. As discussed above, the award for money had and received constituted the Reyes Family's proportionate share of the $83,000 profit they would have received from the sale of the property to Tornillo DTP, while the award for statutory fraud corresponded with the improvements the Reyes Family made to the property, which they were forced to dismantle after Burrus fraudulently sold the property in disregard of their ownership interest. Accordingly, we conclude there was no impermissible double recovery. We overrule all of Burrus's issues on appeal.

## CONCLUSION

The trial court's judgment is affirmed.

Hughes, J., not participating

and worked seasonally sorting pecans.