

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-23-00355-CV

---

New Mission Home Care, LLC, Appellant

v.

Tony Lawrence Read, Individually and as Independent Administrator
of the Estate of George Read, Deceased, and Bertha Acosta, Individually
and as Independent Administrator of the Estate of
Teresa Acosta Read, Deceased, Appellees

---

On Appeal from the 205th District Court
El Paso County, Texas
Trial Court No. 2020DCV1099

---

## MEMORANDUM OPINION

New Mission Home Care, LLC appeals a judgment in which it was held jointly and severally liable for the entire $13 million jury verdict in this car-train collision case. Jury charge error resulted in the jury deciding on an incomplete definition of "course and scope" of

employment, which error was preserved for appeal. Because legally insufficient evidence supported the Appellees' vicarious liability claim against New Mission based on the correct course-and-scope definition, and legally insufficient evidence supported the Appellees' direct liability claims against New Mission, we reverse the trial court's judgment and render a take-nothing judgment in favor of New Mission.

## I. BACKGROUND

### A. Factual background

#### (1) New Mission's services

New Mission provides services to elderly, sick, and disabled individuals. At the time of the accident, it employed 350–400 personal assistants. New Mission is licensed by the Texas Health and Human Services Commission as a Home and Community Support Services Agency under Chapter 142 of the Texas Health and Safety Code. It is also governed by Title 40, Chapter 47 of the Texas Administrative Code.[1] Under § 47.41 of the regulations, New Mission's individual providers are permitted to help clients with certain ADLs (Activities of Daily Living) such as bathing, dressing, and grooming, and certain IADLs (Instrumental Activities of Daily Living) such as cleaning, laundry, and shopping. 40 Tex. Admin. Code § 47.41(1)–(2) (Tex. Dep't of Aging and Disability Services, Primary Home Care, Community Attendant Services, and Family Care Programs, Service Plan Development). "[A]rranging for transportation" is also permitted, as is "escorting" a client, which may involve "accompanying the individual outside the home to support the individual in living in the community." *Id*. § 47.41(2)(D).

Section 47.41 expressly prohibits "direct individual transportation" of a client. *Id*. New

---

[1] Effective July 1, 2024, after the trial in this case, Title 40, Chapter 47 was transferred to Title 26, Chapter 277 of the Texas Administrative Code. 49 Tex. Reg. 4105, 4436 (2024). We refer to former Chapter 47's provisions throughout this opinion.

2

Mission also expressly prohibits direct transportation; its Employee Handbook states that "[p]atient/client transportation either in the employee's and/or patient/client's vehicle is not permitted[,]" and its Unauthorized Tasks list includes "transport[ing] client/family." The Unauthorized Tasks list is signed and dated by both New Mission's individual providers and its clients.

New Mission provided services to George Read under a referral from the VA. The VA referral documents identified his medical conditions and included nursing assessments and self-assessments of his needs, i.e., his ADL and IADL dependencies.

### (2) The collision

The car-train collision at issue occurred on September 13, 2019, while Debra Lopez—an employee of New Mission—along with George Read, his wife (Teresa Acosta Read), and her sister (Bertha Acosta) were returning to the Reads' home in Clint, Texas after a trip to JC Penney. The Reads had asked Lopez to take them there to return a pair of pants. Lopez was driving the Reads' car.

As Lopez drove south on FM 1110, she approached a railroad crossing with two tracks running east-west. The railroad crossing arms were lowered and the lights were flashing. To Lopez's right, a Union Pacific train was stopped on the nearer track a few feet from the crossing blocking her view of the track behind it. Lopez waited in line with at least 15 cars ahead of her. At some point, she got out of the line and drove down a road running parallel to the tracks. It turned out to be a dead end, so she returned to the crossing at FM 1110. By then, cars on both sides of the tracks were driving around the lowered crossing arms. Although Lopez knew that doing so was prohibited, she decided to follow the other cars.

Lopez drove around the lowered crossing arms and "started edging little by little" across the first track, trying to "peek past the [stopped] train to see if there was anything coming" on the

3

second track. But the front of the car was already jutting onto the second track when Lopez saw a moving train come into view on/ that track, heading toward her from the west. Lopez was unable to take evasive action quickly enough, and the train hit the right side of the car "between the front of the car and the [front passenger] door." The impact spun the car around and ejected George Read from the front passenger seat. His injuries were fatal. Teresa Acosta Read and Bertha Acosta were also injured.

## B. Procedural background

In March 2020, the passengers and a related party (collectively, the Reads)[2] filed suit against Lopez, New Mission, and Union Pacific, asserting negligence and negligence-per-se claims against Lopez; respondeat-superior and negligent hiring, retaining, training, and supervision claims against New Mission; a negligence claim against Union Pacific; and gross negligence claims against all defendants. Over two years later, the trial court granted summary judgment in New Mission's favor and entered a take-nothing judgment on all claims against it.

Next entered new counsel for the Reads, who moved for reconsideration. The trial judge transferred the case to a different court due to a conflict of interest. The new judge vacated the previous take-nothing judgment and, after Lopez was nonsuited, held a jury trial on the claims against New Mission and Union Pacific. When the Reads rested, New Mission moved for a directed verdict, which was denied as to all claims except gross negligence, in regard to which the motion was taken under advisement. The Reads later nonsuited their gross negligence claims at some point before the jury charge was finalized.

---

[2] Originally, Teresa Acosta Read sued individually and as Representative of the Estate of George Read, and Bertha Acosta and Tony Lawrence Read (George Read's son, not a passenger) sued individually. By the time of this appeal, Teresa Acosta Read had also died, and Bertha Acosta proceeded as Independent Administrator of the Estate of Teresa Acosta Read in addition to continuing in her individual capacity, and Tony Lawrence Read proceeded as Independent Administrator of the Estate of George Read in addition to continuing in his individual capacity.

The jury returned a 10-2 verdict for the Reads, finding: (1) Lopez acted within the course and scope of her employment with New Mission on the occasion in question; (2) Lopez, New Mission, and Union Pacific were negligent and the Reads were not; and (3) Lopez was 52% responsible for the Reads' injuries, New Mission was 40% responsible, and Union Pacific was 8% responsible. The jury awarded the following damages: (1) $7.5 million to George Read for conscious pain and mental anguish; (2) $1.5 million to Teresa Acosta Read for past physical pain/mental anguish plus $1 million for past physical impairment; (3) $1.5 million to Bertha Acosta for past physical pain/mental anguish, physical impairment, and disfigurement plus $1.5 million in future damages; and (4) $0 to Tony Read for his loss of companionship/society and mental anguish.

New Mission moved for judgment notwithstanding the verdict, which was denied, and the trial court entered judgment in accordance with the Reads' motion for entry of judgment. The Reads later filed an amended motion for judgment asking that New Mission be held jointly and severally liable. The trial court entered an amended judgment granting this request. After judgment was entered, the Reads settled with Union Pacific. New Mission filed a motion for new trial, which was denied. This appeal followed.

## II. ISSUES ON APPEAL

New Mission raises eight issues on appeal. In Issues One and Two, it challenges whether legally or factually sufficient evidence supports the jury's findings that Lopez acted in the course and scope of her employment with New Mission at the time of the collision, (Issue One), and that New Mission's own negligence proximately caused the collision (Issue Two).

In Issues Three and Four, New Mission raises jury charge error, contending the trial court erred by submitting a definition of course and scope of employment that was too narrow (Issue

5

Three), and by including Lopez in the negligence and proportionate responsibility questions despite that she was nonsuited (Issue Four).

In Issues Five and Six, New Mission challenges the damages awarded, urging that the evidence was neither legally nor factually sufficient to support the awards for George Read's pain and mental anguish (Issue Five) or the other plaintiffs' noneconomic damages (Issue Six).

Finally, in its last two issues, New Mission complains of judgment formation errors, contending the trial court erred by imposing joint and several liability on New Mission (Issue Seven), and by declining to require the Reads to disclose any post-trial settlement with Union Pacific and not including a credit for any such settlement in the judgment (Issue Eight).

### III. ORDER OF ISSUE CONSIDERATION

Before turning to the merits, we address a preliminary matter. When presented with multiple grounds for reversing a trial court's judgment, we generally first consider issues that would require us to render judgment (e.g., legal sufficiency); then, assuming these issues are not dispositive, we consider issues that would require a remand (e.g., jury charge error). *FieldTurf USA, Inc. v. Pleasant Grove Indep. Sch. Dist.*, 642 S.W.3d 829, 836 (Tex. 2022) ("[C]ourts of appeals should 'first address issues that would require rendition' and thus should consider those issues before ordering a remand."); *see also Chamblee Ryan, P.C. v. JBS Carriers, Inc.*, 691 S.W.3d 797, 809 (Tex. App.—Tyler 2024, pet. denied) ("Generally, when we sustain a legal-sufficiency issue, we must render judgment . . . ."); *Household Credit Services, Inc. v. Driscol*, 989 S.W.2d 72, 83 (Tex. App.—El Paso 1998, pet. denied) ("Generally, harmful charge error would result in a . . . remand . . . .").

However, when a party correctly objects to a jury charge definition relevant to legal sufficiency, we measure legal sufficiency against the definition that should have been given. *Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 407–08 (Tex. 2016). Here, New Mission challenges

6

the charge's definition of "course and scope" of employment, which is relevant to whether it can be held vicariously liable. *See Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 565 (Tex. 2016) ("[A]n employer may be vicariously liable . . . if [its] employee's actions are within the course and scope of his employment[.]"). Accordingly, rather than first considering the legal sufficiency of the relevant evidence, we begin by considering whether New Mission preserved its objection to the course-and-scope definition in the charge, and if so, whether the correct definition was submitted. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002) (evaluating legal sufficiency against correct definition where error relating to incorrect definition preserved).

## IV. JURY CHARGE "COURSE AND SCOPE" DEFINITION

### A. Standard of review

We review a trial court's decision whether to include a jury charge definition under an abuse-of-discretion standard. *King Fisher Marine Serv., L.P. v. Tamez*, 443 S.W.3d 838, 842 (Tex. 2014). A trial court "enjoys considerable discretion in framing a jury charge and is given broad latitude to determine the propriety of explanatory instructions and definitions." *Rhey v. Redic*, 408 S.W.3d 440, 462 (Tex. App.—El Paso 2013, no pet.). However, a trial court abuses its discretion if it refuses a definition that is raised by the written pleadings and the evidence. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) ("A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue."); *see also Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) ("A trial court must submit jury questions, instructions, and definitions raised by the written pleadings and the evidence.") (internal quotation marks omitted); Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions . . . raised by the written pleadings and the evidence.").

7

## B. Did New Mission preserve error?

At trial, New Mission requested both a question and a definition relating to "course and scope" of employment. As to its requested *question*, which was not included in the charge, New Mission complains of no error by the trial court. As to its requested *definition*, New Mission argues the trial court erred by submitting an overly narrow course-and-scope definition. The charge included the following definition: "'Course and Scope' means that the employee is acting in furtherance of the business of her employer." In contrast, New Mission requested and the court refused the following definition:

> "Course and Scope of Employment" means an employee is acting in the scope of her employment if she is acting within the general authority given to her, in the furtherance of the business of her employer, and for the accomplishment of the nature of services for which the employee was employed.

The Reads do not contend New Mission failed to preserve error by failing to timely request this definition, failing to obtain a ruling, or failing to submit it in substantially correct form. We conclude that New Mission preserved error relating to its requested course-and-scope definition. *See Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 919–20 (Tex. 2015) ("[T]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.") (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)).

## C. Was the correct definition submitted?

In support of its requested course-and-scope definition, New Mission cites *Painter v. Amerimex Drilling I, Ltd.*, which held that "vicarious liability arises only if the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." 561 S.W.3d 125, 131 (Tex. 2018) (internal quotation marks omitted). *Painter*'s three-element definition dates back at

8

least as far as 1891. *See Int'l & G.N.R. Co. v. Anderson*, 17 S.W. 1039, 1040 (Tex. 1891) ("[T]he act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed."). The Texas Supreme Court has cited the same definition many times over the years. *See, e.g., Int'l & G.N.R. Co. v. Cooper*, 32 S.W. 517, 518 (Tex. 1895) (citing *Anderson*, 17 S.W. at 1040); *Texas Power & Light Co. v. Denson*, 81 S.W.2d 36, 38 (Tex. 1935) ("The rule in this state is that if the act complained of is done within the scope of the general authority of the servant, in furtherance of the master's business and for the accomplishment of the object for which the servant is employed, the master is liable."); *Broaddus v. Long*, 138 S.W.2d 1057, 1059 (Tex. 1940) ("In order to render the master liable for the act of his servant, such act must be committed within the scope of the general authority of the servant, in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed."); *Texas & P. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 239–40 (Tex. 1952) (same); *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357, 359 (Tex. 1971) (same); *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (same); *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (same).

The shorter definition submitted to the jury in the present case—"'Course and Scope' means that the employee is acting in furtherance of the business of her employer"[3]—lacked two

---

[3] The Reads note that this definition comports with Texas Pattern Jury Charge 10.6. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 10.6 (2022) (PJC Negligence) ("An employee is acting in the scope of his employment if he is acting in the furtherance of the business of his employer."). But as New Mission points out, pattern jury charges "are not themselves the law," and they must be departed from when necessary to correctly state the law. *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 332 n.14 (Tex. 2024). Further, as New Mission noted at the charge conference, PJC 10.6 includes a comment cautioning that a longer course-and-scope definition should be used when the issue of general authority is disputed: "The element of general authority, however, is not included in PJC 10.6 because it is usually undisputed. If it is disputed, the phrase 'and within the scope of general authority given him by his employer' should be added at the end of the definition." PJC Negligence 10.6 cmt. Here, as discussed below, whether Lopez acted within her general authority was disputed.

9

of the three elements in *Painter*'s definition, i.e., that the employee must also act "within the scope of the employee's general authority" and "for the accomplishment of the object for which the employee was hired." *See Painter,* 561 S.W.3d at 131.

As to the "within the employee's general authority" element, New Mission argues that whether transporting clients fell within Lopez's general authority was "definitely disputed," and that Lopez acted outside her general authority because she "was expressly prohibited by Texas law and company policy from transporting clients[.]"

The Reads counter that "violation of a company policy does not, standing alone, establish that an employee is acting outside the course and scope of employment[,]"[4] citing *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 139 (Tex. 2003); *Hooper v. Pitney Bowes, Inc*., 895 S.W.2d 773, 777 (Tex. App.—Texarkana 1995, writ denied); and *J.V. Harrison Truck Lines, Inc. v. Larson*, 663 S.W.2d 37, 40 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.).

New Mission does not rely solely on violation of its policy. It also relies on evidence that Lopez and each of the car's occupants all understood that transporting clients was prohibited; that Lopez and George Read repeatedly affirmed in writing that they understood this prohibition existed; that Lopez and Teresa Read did not tell New Mission about Lopez transporting the Reads because they knew it was prohibited; that New Mission was not aware of such incidents; that Lopez herself characterized her conduct as being motivated by personal feelings (i.e., she did certain prohibited things "on her own" because she loved George Read, and not as "something that had a New Mission stamp on it"); and that transporting clients is prohibited by state regulations.

---

[4] The Reads further maintain that we "should not engage in a 'task-by-task analysis for course and scope,'" citing *Garza v. RDL Energy Services, LP*, 697 S.W.3d 663, 670 (Tex. App.—El Paso 2022, no pet.). However, *Painter*, *Garza*'s authority for this proscription, *see id.*, explains that it applies to an employee-status inquiry, not a course-and-scope inquiry. *See Painter*, 561 S.W.3d at 133–34, 138.

To be entitled to its requested definition, New Mission was required to show that the definition was "raised by the written pleadings and the evidence."[5] *Brumley*, 616 S.W.3d at 831; Tex. R. Civ. P. 278. The Reads do not argue that New Mission's pleadings were insufficient to meet this standard. Nor do they argue that the evidence relied on by New Mission was insufficient. Instead, the Reads focus on *other* evidence—namely, evidence they contend supports *their position* that Lopez acted within her general authority—including evidence they claim shows Lopez was "at work during working hours, not driving to and from work"; that she "would transport Mr. Read to doctor's appointments or to run errands"; that she transported the Reads "as part of the work requested from Mr. Read"; that "[t]he VA forms . . . included an option for transportation"; and that New Mission "knew of, but did not discipline, employees for transporting[.]" Such evidence does not show that New Mission's requested definition was not raised by the evidence it cited.

We conclude that, considered in its entirety, the evidence presented to the jury raised the issue of whether Lopez acted within her general authority, and thus the trial court erred by refusing New Mission's requested definition, at least with respect to the "within the employee's general

---

[5] Rather than addressing this standard, the Reads contend that, "to the extent New Mission alleges that the course-and-scope question should have included an instruction that Lopez was within the scope of her general authority, New Mission does not show how that actually changes the analysis," i.e., "New Mission has not shown that [Lopez] was not in the scope of her general authority just because the act she performed was allegedly unauthorized. This lack of authorization is not a *de facto* removal of the employee's actions from the scope of the general authority." However, the Reads cite no authority that New Mission was required to demonstrate a "de facto removal" of Lopez's actions from the scope of her general authority. In addition, including the "within the employee's general authority" element in the definition of "course and scope" *does* change the analysis, as an employee's conduct might further the employer's business (e.g., by generating revenue) yet fall outside the employee's general authority (e.g., by deviating from the general nature of the employee's work), and thus not give rise to vicarious liability. *See, e.g.*, *Zarzana v. Ashley*, 218 S.W.3d 152, 161 (Tex. App.—Houston [14th Dist.] 2007, pet. struck) (holding employee acted outside course and scope of employment because conduct at issue was unauthorized; evidence of monetary benefit to employer did not bar summary judgment in employer's favor). For similar reasons, we likewise disagree with the Reads' contention that New Mission has not shown its requested definition "was necessary in order to properly put the issue before the jury."

11

authority" element.[6]

Next, using the definition of course and scope that should have been given—i.e., an employee acts within the course and scope of her employment if she acts within the scope of her general authority and in furtherance of her employer's business—we assess the legal sufficiency of the evidence supporting imposition of vicarious liability on New Mission.

## V. LEGAL SUFFICIENCY

### A. Standard of review

When both legal and factual sufficiency challenges are presented, we address the former first. *Burrus v. Reyes*, 516 S.W.3d 170, 194 n.23 (Tex. App.—El Paso 2017, pet. denied) (citing *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (per curiam)). In reviewing the legal sufficiency of evidence supporting a jury verdict, we "view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 783 (Tex. 2020) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We will sustain a legal sufficiency challenge only if (1) there is a complete absence of evidence proving a vital fact, (2) the rules of law or evidence bar us from weighing the only evidence proving a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively disproves the existence of a vital fact. *Westwood Motorcars, LLC v. Virtuolotry, LLC*, 689 S.W.3d 879, 885 (Tex. 2024).

### B. Vicarious liability

For New Mission to be vicariously liable for Lopez's conduct in transporting the Reads,

---

[6] Neither party addresses the "accomplishment of the object" element in *Painter*'s course-and-scope definition. Accordingly, we do not consider this element either with respect to charge error or legal sufficiency.

Lopez must have acted within the course and scope of her employment. *Ineos*, 505 S.W.3d at 565. As discussed above, the course-and-scope definition that should have been given in the charge is that an employee acts within the course and scope of her employment if she acts within the scope of her general authority and in furtherance of her employer's business. Neither side focuses on the "in furtherance" element.[7] Rather, both sides focus on whether Lopez acted within her general authority. In regard to this element, New Mission argues the evidence "conclusively established" that it "did not authorize Lopez to transport the Reads in a vehicle and in fact expressly prohibited it."

In turn, the Reads contend legally sufficient evidence supported at least one of the following theories: (1) New Mission expressly authorized direct transportation of clients; (2) New Mission impliedly permitted such transportation; (3) Lopez believed direct transportation was included in her duties; or (4) direct transportation was of the same general nature as the services Lopez was authorized to provide. We consider the referenced evidence for each theory below.

### (1) Express authorization

To show New Mission "expressly . . . allowed providers to transport clients," the Reads cite evidence purportedly showing that the VA authorized such conduct for its referred clients.

In particular, the Reads cite a ten-page passage from the trial testimony of Rodolfo Leos, New Mission's Personal Assistants Coordinator, in support of the proposition that "[a]s part of its state-funded Medicaid protocol, New Mission employees were not supposed to transport clients[,]" but "the federally-run VA did not have such restrictions on transportation provisions and in fact

---

[7] New Mission limits its discussion of this element to the bare assertion that "even if the sufficiency of the evidence were properly measured against only the charge as given, an activity that was expressly prohibited by New Mission and Texas law was not an action in furtherance of New Mission's business." And the Reads merely cite without discussion Lopez's "yes" answer to the conclusory question, "And you did it [performing disallowed tasks] in furtherance of the care that you were providing as a New Mission employee?" Because we conclude below that the record contains legally insufficient evidence to support the general authority element, we need not consider whether sufficient evidence supported the "in furtherance" element.

authorized New Mission to provide transportation to Mr. Read." However, Leos testified neither that the VA had no restrictions on transportation nor that the VA authorized New Mission to provide transportation. Rather, Leos essentially testified to the opposite: that while the VA "identified all the assistance [George Read] need[ed]," New Mission "[is] regulated, so we—there's certain things that we cannot do," and "[t]ransportation is one of them." Leos testified that New Mission was required to comply with state law in providing services to VA clients:

Q. Okay. This is Veterans Affairs. This is a federal program. You understand that; right?

A. Correct. But the agency is licensed through the state to be able to receive these contracts, so we must follow state guidelines.

Q. So, sir, you're saying that even though this authorization tells you this veteran, Mr. Read, needs this help on his ADLs, you get to pick and choose which ones to provide?

A. Not necessarily pick and choose, but there are rules that we must follow. And the Veteran Affairs know, so that's—they might identify his needs but not necessarily that the agency will provide.

While the Reads contend the jury was allowed to disbelieve Leos's testimony regarding the applicability of state law, the jury was not allowed to infer from his testimony the opposite of what he said. *Miller v. Superior Forestry Serv., Inc.*, No. 03-17-00043-CV, 2018 WL 4039562, at *1 (Tex. App.—Austin Aug. 24, 2018, pet. denied) (mem. op.) ("[T]he jury's decision that a witness is not credible generally 'is not considered a sufficient basis for drawing a contrary conclusion.'") (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) and citing *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 853 (Tex. 2005) ("Jurors of course would not be required to accept the truth of these affidavits. But the possibility that a jury might disbelieve them is not evidence supporting the contrary.")).

In addition, the Reads cite the VA referral forms themselves in support of the proposition that the VA "specifically requested/authorized [transportation] for Mr. Read," and "Mr. Read's coverage through the VA expressly provided that he would receive transportation services." The

14

VA referral forms, the Reads explain, "instruct home health agencies as to the services the client needs and can receive." Here, one such form included an "RN ADL assessment" listing George Read's ADL dependencies as "dressing, grooming, bathing, bed mobility, transferring, walking, toileting." The form also listed the following items under the heading "Veteran/caregiver states Veteran is dependent in these Instrumental ADLs":

- Using the phone      Comment: no –
- Shopping      Comment: no –
- Food preparation      Comment: yes –
- Laundry      Comment: yes –
- ***Transportation***      ***Comment: yes –***
- Housekeeping      Comment: yes –
- Finances (reminders)      Comment: no –
- Medication reminders      Comment: yes

(emphasis added).

Even following the Reads' argument, the VA did not "specifically request/authorize" transportation for Mr. Read during the relevant time period, as the "last day of authorized services" for this form was August 31, 2019, i.e., before the accident. The VA referral form for the relevant timeframe does not mention transportation, and states only the following in regard to IADLs: "Veteran states that his wife and the caregiver and his neighbors take care of all of his IADLs except the phone."[8]

Moreover, even the expired referral form merely identified transportation as a self-assessed dependency and did not indicate that the VA required or expected all such dependencies to be addressed, or addressed by a particular provider or other person, or addressed in a particular way. Nor did the form distinguish between *direct* transportation and *arranging* for transportation, e.g.,

---

[8] The form provides no details regarding who among these parties—George Read's wife, caregiver, and neighbors—may have provided assistance with specific IADLs.

via ride-sourcing, taxi service, escorting a client on public transportation, etc.[9] Further, like Leos's testimony, the form did not indicate that state transportation regulations were inapplicable.[10] Nor do the Reads point to any federal or state statute, regulation, agency policy or guideline, or anything else indicating that state-law transportation restrictions in general, or § 47.41 in particular, would not apply to the VA-funded services New Mission provided.[11]

### (2) Implied permission

The Reads contend that "even if [Lopez] did not have express permission to drive the Reads, she did have implied permission, as there was evidence that New Mission knew of, but did not discipline, employees for transporting [clients]," citing *Painter*, 561 S.W.3d at 136 (recognizing that employee may act in furtherance of employer's business with its "express or implied approval").

In support of this theory, the Reads cite evidence they contend supports the following propositions: (1) "[t]ransportation was a common practice for providers who care for the elderly"; (2) New Mission "was aware that transportation was provided through agreements between the providers and clients"; (3) New Mission "was aware, in reviewing documents filled out by one of George Read's previous providers, that a New Mission provider was providing transportation to Mr. Read"; (4) Lopez testified that "a prior provider had provided transportation for the Reads"; (5) New Mission received money from the VA, sent no money back, and paid Lopez "for her time

---

[9] Under state law, New Mission was prohibited only from providing direct transportation, not from arranging for transportation or escorting a client. *See* § 47.41(2)(D) (prohibiting "direct individual transportation" but allowing "arranging for" transportation and "escorting" a client).

[10] Nor does it seem plausible that the VA, in contracting for services for its client population, would exempt a private entity like New Mission from having to comply with state transportation regulations any more than it would exempt an individual providing transportation from having to obtain a driver's license or having to obey the rules of the road.

[11] Like the expired VA referral form discussed above, a preprinted VA form provided to Lopez to check off tasks she was performing listed "transportation" along with other ADLs and IADLs. But like the referral form, this form neither indicated all checkboxes were relevant to all providers, nor distinguished between direct transportation and arranging for transportation or escorting, nor indicated that state transportation restrictions were inapplicable.

16

up to and including the crash"; and (6) services were often provided by New Mission "beyond what was specifically authorized for a particular care patient, such as phone use and shopping." We consider the evidence upon which each of these contentions relies.

First, Lopez testified that transporting clients was "common practice" in the industry, but she disclaimed any knowledge that it was a common practice at New Mission:

Q.   . . . Are you aware of other New Mission providers providing transportation?

A.   I couldn't say with New Mission, but I do know of other providers that do."

Second, during trial, the Reads asked Leos, "But being in the industry as long as you have, you know that providers, they transport clients and they have agreements with clients to transport them; right?" Leos responded, "No, I'm not aware," after which the Reads' counsel attempted to impeach him, suggesting that he told the sheriffs during a videotaped interview that he was aware of transportation agreements. Leos went on to testify that he was aware transportation agreements between providers and clients "existed," that "it's difficult for us to find out whatever agreement they made," and that "[p]eople sometimes say things, but there's no specific agreements that I'm aware of or have ever been aware of." The videotaped interview was not admitted in evidence.

Third, while Liveth Rodriguez, one of George Read's prior providers, checked the "transportation" box on the VA's task check-off form three times in a two-week period, the forms in question were signed by Rodriguez on August 21, 2019, less than a month before the September 13, 2019 accident. The record reflects neither when the forms were processed nor by whom. Further, nothing in the record indicates when New Mission management first became aware that Rodriguez had checked the transportation box. *See Fossil Group, Inc. v. Harris*, 691 S.W.3d 874, 885 n.33 (Tex. 2024) ("The key to whose knowledge may be imputed to the employer is remedial power: There is no actual knowledge until someone with authority to address the problem is notified."). In addition, the record does not reflect that the transportation box was checked by

17

any of New Mission's other 350–400 providers at any time.[12]

Fourth, Lopez testified that a prior provider[13] took the Reads to JC Penney to buy the pants they were returning the day of the incident, but she did not testify that she told anyone; moreover, her own knowledge would not be imputable to New Mission. *See Fossil Group,* 691 S.W.3d at 885 n.33.

Fifth, while there was evidence New Mission received money from the VA, sent no money back, and paid Lopez for the day in question, Lopez did not testify that she was paid "for her time up to and including the crash." In the testimony cited by the Reads, Lopez was asked only whether she was "paid for [her] time for that day" and whether she "got paid that—for that day," not whether the time she claimed included transporting the Reads. On the VA check-off form for the day in question, Lopez checked the boxes for bathing, grooming, dressing, and transfers, but not transportation. Additionally, Lopez's timesheet for the two-week period in question listed numerous assigned tasks—bathing, dressing, exercise, feeding, grooming, hair/skin care, toileting, ambulation, cleaning, laundry, walking, meal prep, and ass[is]t with self-administered

---

[12] While there is no evidence Lopez ever checked the transportation box, there is evidence she had transported the Reads before the accident. However, she testified she never told anyone at New Mission she had done so.

Q.   [I]n the whole year and a half that you worked for New Mission, you never told New Mission that you were transporting the Reads; is that true?
A.   True
Q.   . . . And did you ever report to them during that time that you were transporting any clients?
A.   No, sir.

And Leos testified he was never informed of any such activity.

Q.   At any time while Ms. Lopez had been performing her responsibilities as a[n] attendant for Mr. Read, did she ever report to you that she was transporting the Reads?
A.   No.
Q.   At any time?
A.   No, sir.
Q.   And—and did you receive any such information from any of your management or your staff about Ms. Lopez transporting the Reads?
A.   No, sir.

[13] This unnamed prior provider may or may not have been Liveth Rodriguez; the record does not say.

18

medications—but again not transportation. And while the Reads contend "caregiver assessments sent to the VA indicated [transportation] services were being provided," the forms in question listed numerous "approved tasks," but not transportation, and were almost always accompanied by a copy of New Mission's non-authorized task list, which included the following item: "MAY NOT TRANSPORT INDIVIDUAL/FAMILY."

Sixth and finally, while there was testimony that "phone use" and "shopping" services were sometimes provided by New Mission without being "specifically authorized," the Reads do not contend either of these services was prohibited by state or federal law. Evidence that non-prohibited conduct occurred is not evidence that prohibited conduct was permitted.[14]

### (3) What Lopez believed

The Reads contend New Mission "authorized providers to shop and 'escort' clients, which could conceivably involve transporting a client"; "[t]hus, a provider such as Lopez could reasonably believe that escorting a client on a shopping trip would be authorized, even if she was driving them." However, Lopez did not testify that she held such a belief. To the contrary, Lopez testified that she understood the prohibition against directly transporting clients was a "bedrock rule" and had no question or confusion about it.

The Reads further contend Lopez "understood . . . she was executing and performing a duty she was hired to do in the care of Mr. Read by providing transportation within her normal working hours of employment with New Mission and . . . was furthering the business of

---

[14] The Reads further generally contend: (1) New Mission "set Lopez up to fail"; i.e., Lopez "could either provide the necessary services for Mr. Read, allegedly in violation of her authorization, or she could refuse to provide such services and therefore fail to fully comply with her duties to care for a New Mission client who needed transportation services"; and (2) New Mission "relies on the logical fallacy that it was allowed to perform services that were not authorized by the VA and get paid for them, but Lopez was in the wrong by providing services that were specifically requested by the VA that New Mission alleges it does not provide." However, these contentions assume Lopez had a duty or authority to transport clients and the VA expected New Mission to provide direct transportation rather than arrange for transportation, assumptions unsupported by the record.

19

New Mission." In support, the Reads cite the following testimony by Lopez:

Q. [Transporting of clients] [is] very common; right?

A. Yes.

Q. Despite any rules or regulations that might exist?

A. Yes. Because we become like a family unit, and you know that they need their medications or doctor visits and they have no way to go. So it's like if you see your grandparent or your mother or, you know, whoever you're caring for, you just want to help them.

Q. And you know—you see that that's something that they need as part of their care?

A. Yes.

. . .

Q. What is your understanding—I mean, you've worked in the industry for a while; correct?

A. Well, it's not only that. It's the same thing like the Reads had—their lawn would need to be mowed; I would help them mow it. They needed an air filter in their air conditioner to be changed out and I would help them. It's stuff like that that we're not allowed to do but you would do it because you know that they needed the help and you loved them.

Q. And you did it in furtherance of the care that you were providing as a New Mission employee?

A. Yes.

. . .

Q. Okay. I'm trying to understand, what are your feelings as far as that day at the time of the incident concerning if you were carrying out your duties of caring for George Read with being employed by New Mission?

A. That I was helping my—my Georgie and Ms. Tere to get what they needed to get done.

Q. You were doing what they hired you to do?

A. Yes, sir.

However, rather than indicating Lopez understood she had acted within the scope of her general authority, this testimony reflects the opposite understanding, i.e., that certain things—like direct transportation—were things "we're not allowed to do [for clients] but you would do it because you know that they needed the help and you loved them." While it was within the jury's purview to assess her credibility, the jury could not infer from her testimony the opposite of what

20

she said. *Miller*, 2018 WL 4039562, at \*1.[15]

### (4) The nature of direct transportation

In their post-oral-argument brief, the Reads contend driving George Read on a shopping errand fell within the scope of Lopez's general authority because it was conduct "of the same general nature" as ADL-based services she was authorized to perform. In support of this proposition, the Reads cite *Knight v. City Streets, L.L.C.*, 167 S.W.3d 580, 583 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Country Roads, Inc. v. Witt*, 737 S.W.2d 362, 364 (Tex. App.—Houston [14th Dist.] 1987, no writ); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 617–18 (Tex. 1999); and *Dictaphone Corp. v. Torrealba*, 520 S.W.2d 869, 872 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). These cases are distinguishable.

*Knight* and *Country Roads* both involved use-of-excessive-force claims against a nightclub based on the conduct of its employees. *Knight* explained the "same general nature" concept as follows: "An assault . . . will be found to be within the scope of . . . employment when the assault is of the same general nature as the conduct authorized"; thus, "if the employer places his employee in a position that involves the use of force, . . . the employer can be found liable for its employee's actions even if the employee uses greater force than is necessary." 167 S.W.3d at 583. Here, however, as discussed above, the evidence showed that New Mission did not place Lopez in a position that involved transporting clients; rather, such conduct was expressly excluded from Lopez's job duties both by Texas law and New Mission policy.

---

[15] We note that Lopez answered "yes" to the questions, "And you [performed disallowed tasks] in furtherance of the care that you were providing as a New Mission employee?" and "You were doing what they [the Reads] hired you to do?" As noted above, however, the "in furtherance" element of "course and scope" is not focused on by either side, nor is this issue outcome-determinative. It is undisputed that Lopez was New Mission's employee, not the Reads' employee. And while the Reads' post-oral-argument brief contends "[Lopez] testified that she was acting in the course and scope of her employment in driving the Reads on a shopping errand," the cited pages in the record contain no such testimony. Moreover, Lopez's opinion on this ultimate question is irrelevant. *See Painter*, 561 S.W.3d at 132 (holding that the course-and-scope analysis "hinges on an objective assessment of whether the employee was doing his job").

21

*GTE* involved allegations of workplace harassment, including a supervisor's yelling, screaming, cursing, and "charging" at his subordinates. 998 S.W.2d at 609. The Texas Supreme Court held that, "[i]f [an] intentional tort is committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity, the employer may be liable." *Id.* at 618. However, again, here the evidence showed that transporting clients was not a duty entrusted to Lopez, but rather something she was prohibited from doing by state law and New Mission policy. Further, Lopez testified that she transported the Reads because of her personal feelings for them, i.e., did so "on her own" because she loved them, not as "something that had a New Mission stamp on it."

Finally, *Dictaphone* involved a car-pedestrian collision caused by a traveling salesman. 520 S.W.2d at 870–71. The Reads cite *Dictaphone* for the proposition that an employee's mixed motives for engaging in an authorized activity in a particular manner will not remove the activity from the scope of the employee's general authority:

> The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service, as where the servant drives rapidly, partly to deliver his master's goods, but chiefly in order to terminate his day's work or to return the vehicle to the master's premises.

520 S.W.2d at 872. Again, here, the evidence showed transporting clients was not an authorized activity; rather, it was a prohibited activity that Lopez engaged in "on her own" because she loved the Reads.

After giving due consideration to all four of the Reads' theories and the evidence they contend supports that Lopez was acting within the general authority given to her by New Mission, we conclude that the record contains legally insufficient evidence to support Read's vicarious liability claim against New Mission. We turn to the Reads' direct liability claims next.

22

## C. Direct liability

The Reads' direct liability claims against New Mission included negligent hiring, retaining, training, and supervision. New Mission argues that "any failure [by New Mission] to vet or train or supervise [Lopez] on [her] job duties . . . was not the proximate cause of Lopez's negligence in driving . . . around an activated crossing arm at a train crossing." In response, the Reads contend the jury heard legally sufficient evidence that New Mission both "negligently hired and retained" and "negligently trained and supervised" Lopez. We consider these theories in turn.

### (1) Hiring and retaining

As the Reads note, to prevail on a negligent hiring and retention claim, a plaintiff must show that (1) the defendant engaged in negligent hiring and retention practices, and (2) the plaintiff suffered damages from the foreseeable misconduct of an employee. *Wansey v. Hole*, 379 S.W.3d 246, 247 (Tex. 2012) (per curiam). In addition, the plaintiff must show the defendant "created an unreasonable risk of harm to others by hiring someone it knew, or by the exercise of reasonable care should have known, was incompetent or unfit." *Mejia-Rosa v. John Moore Services, Inc.*, No. 01-17-00955-CV, 2019 WL 3330972, at *10 (Tex. App.—Houston [1st Dist.] July 25, 2019, no pet.) (mem. op.). That is, an employer is not negligent "when there is nothing in the employee's background that would cause a reasonable employer not to hire or retain the employee." *Id*. Thus, the plaintiff "must prove that [the employee in question] was unfit or incompetent[.]" *Id*.

Here, the Reads argue "[t]he jury heard the following evidence, which was legally . . . sufficient to support any finding that New Mission negligently hired and retained Lopez":

- When hired at New Mission, Lopez filled out an application and underwent only a 15-minute process that included an interview and filling out new hire forms which was the extent of her training;
- She was not interviewed;
- No prior employer references were checked to determine her competency;
- Without more, Lopez was released to work with clients;

23

- New Mission knew the date of expiration of Lopez's license, and was made aware by Lopez that she had an invalid driver's license before the incident;
- New Mission failed to check for prior employment references; instead, New Mission relied on Lopez's family and friends;
- The documentation received from the VA expressly identified transportation as a necessary activity of daily living to be provided;
- New Mission was aware, in reviewing documents filled out by one of George Read's previous providers, that a New Mission provider was providing transportation for Mr. Read; and
- The activities of daily living included "shopping," and "escorting" which showed that driving was contemplated as part of the job.

(record citations omitted).

While such evidence might show New Mission could have engaged in a more in-depth process in hiring and retaining Lopez, none of the listed points address proximate cause, particularly as to the foreseeability of Lopez's decision to drive around the lowered railroad crossing arms. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 874 (Tex. 2023) ("Proximate cause has two elements: cause in fact and foreseeability. Cause in fact is established when the act or omission was a substantial factor in bringing about the injury and, without it, the harm would not have occurred. Foreseeability, on the other hand, requires the actor to have reasonably anticipated the dangers that his negligent conduct created for others.") (cleaned up).

Nor do any of the listed points address Lopez's competence or fitness as an employee, even assuming driving "was contemplated as part of the job." The only point pertinent to driving—that New Mission "was made aware by Lopez that she had an invalid driver's license before the incident"—is legally insufficient to support a finding she was incompetent or unfit to drive. We reach this conclusion because similar and more serious driving infractions have been held insufficient to support such a finding. *See Mejia-Rosa*, 2019 WL 3330972, at *11 ("[T]wo traffic citations [one for running a red light and the other for rear-ending a car]—the only evidence . . . offered to show that [the recipient of the citations] was an incompetent or unfit driver—are not

24

enough to create a fact issue.") (citing *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007) (per curiam) (holding citations for driving without liability insurance and rear-ending another car in three-year period prior to hiring and one citation for speeding while employed by defendant insufficient to show driver incompetent or reckless); *Hous. Cab Co. v. Fields*, 249 S.W.3d 741, 746–47 (Tex. App.—Beaumont 2008, no pet.) (holding two convictions for driving without insurance, one citation for injury accident, and one license suspension for failure to carry insurance legally insufficient to support recklessness or incompetence finding); *Nobbie v. Agency Rent-A-Car, Inc.*, 763 S.W.2d 590, 593 (Tex. App.—Corpus Christi 1988, writ denied) (holding two license suspensions, one speeding ticket, and one citation for defective headlamp legally insufficient to support incompetence or recklessness finding)).

### (2) Training and supervising

As the Reads note, negligent training and supervision claims, like all negligence claims, require proof of duty, breach, and proximate cause. And like negligent hiring and retaining claims, negligent training and supervision claims require evidence that the employee in question was incompetent or unfit. *Rayner v. Claxton*, 659 S.W.3d 223, 249 (Tex. App.—El Paso 2022, no pet.) ("[The basis for negligent hiring, training, or supervising claims] is the employer's knowledge . . . that the employee it hires is unfit[.]").

Here, the Reads argue "[t]he jury heard the following evidence, which was legally . . . sufficient to support any finding that New Mission negligently trained and supervised Lopez":

- When hired at New Mission, Lopez filled out an application and underwent only a 15-minute process that included an interview and filling out new hire forms which was the extent of her training;
- She was not interviewed;
- No prior employer references were checked to determine her competency;
- Without more, Lopez was released to work with clients;
- New Mission knew the date of expiration of Lopez's license, and was made aware by Lopez that she had an invalid driver's license before the incident;

25

- At the time of the incident, New Mission had approximately 350–400 providers employed but only two field supervisors who oversaw those 350–400 providers;

- New Mission turned a blind eye to the transportation that was being provided by its caregivers and that Mr. Leos was aware of agreements to provide transportation between providers and clients;

- New Mission did not perform any supervisor visits during any time that Lopez was providing care for the Reads, despite the fact that she provided unauthorized services;

- New Mission authorized providers to provide services such as shopping that were not authorized by the VA despite the VA form indicating in multiple places "DO NOT PROVIDE SERVICES WITHOUT AN AUTHORIZATION! ! !"; and

- New Mission had actual knowledge that Mr. Read received transportation from another New Mission provider approximately one month prior to the crash but did nothing about it.

(record citations omitted).

While such evidence might show New Mission could have done more to train and supervise Lopez, again none of these listed points address proximate cause, particularly as to the foreseeability of Lopez's decision to drive around the lowered railroad crossing arms. *See Rattray*, 662 S.W.3d at 874 (defining proximate cause to include foreseeability). Nor do any of these points address Lopez's competence or fitness as an employee, other than her having an expired driver's license (assuming driving was part of her job), which we conclude is legally insufficient to support a finding of incompetence or unfitness for the reasons discussed above in relation to the Reads' negligent hiring and retaining claims.

We conclude that the record reflects legally insufficient evidence to support the Reads' direct liability claims against New Mission.

## VI. CONCLUSION

Having concluded that the record reflects legally insufficient evidence to support the Reads' vicarious liability and direct liability claims against New Mission,[16] we reverse the trial

---

[16] Because New Mission's legal insufficiency points dispose of the entire case, we do not reach its remaining six points of error. Tex R. App P. 47.1.

court's judgment and render a take-nothing judgment in favor of New Mission.


LISA J. SOTO, Justice

September 29, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting without written opinion